CARMICHAEL, District Director, U. S. Department of Justice, Immigration and Naturalization Service, v. DELANEY.

No. 11748.

United States Court of Appeals
Ninth Circuit.

Oct. 18, 1948.

240

James M. Carter, U. S. Atty., and Ronald Walker and Clyde C. Downing, Asst. U. S. Attys., all of Los Angeles, Cal. (Bruce G. Barber, Dist. Adjudications Officer, Imm. & Nat. Service, of Los Angeles, Cal., on the brief), for appellant.

David C. Marcus, of Los Angeles, Cal., for appellee.

Before DENMAN, Chief Judge, and HEALY and ORR, Circuit Judges.

HEALY, Circuit Judge.

Appellee arrived on the Steamer Schenectady in the harbor of San Pedro on May 20, 1945. He was there duly held by the immigration authorities on their claim that he was an alien entering from a foreign port or country without visa or passport as required by certain acts of Congress and regulations thereunder.[1] Exclusion proceedings before a board of special inquiry were instituted on these grounds, and after a hearing which resulted in a finding of alienage appellee's exclusion was ordered. The ruling was subsequently upheld by the Board of Immigration Appeals.

Meanwhile appellee, alleging that he is a native-born citizen of the United States, petitioned the district court for a writ of habeas corpus. Evidence on behalf of the

---

[1] Immigration Act of May 26, 1924, 8 U.S.C.A. § 201 et seq.; Alien Registration Act, 1940, 8 U.S.C.A. § 451 et seq.; Passport Act of May 22, 1918, 22 U.S.C.A. § 223 et seq.; and Executive Order June 3, 1941, No. 8766.

petitioner was received after the termination of the administrative proceeding. The record made before the board of special inquiry, being incorporated in the director's return to the writ, was also before the court for its consideration. The court found that appellee is an American citizen and ordered his discharge from custody. D.C., 72 F.Supp. 312. The director appeals.

The judge, while treating the proceeding before the board of special inquiry as properly an exclusion proceeding, accorded to the petitioner a judicial trial of his claim of American nativity. The director contends that this was error. He says that the administrative finding that appellee is not a citizen is final and that no ground exists for judicial intervention. Ordinarily, in an exclusion proceeding we understand the law to be as the director contends it to be, United States v. Ju Toy, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040; Tang Tun v. Edsell, 223 U.S. 673, 32 S.Ct. 359, 56 L.Ed. 606; Immigration Act of February 5, 1917, § 17, 8 U.S.C.A. § 153;[2] and if this were all there is to be said of the case we would be obliged to reverse the trial court inasmuch as the administrative finding of alienage was substantially supported by the evidence before the board.

But this is by no means all there is to be said of the matter. From the record on appeal two questions emerge, (1) whether in legal contemplation an entry was involved, and (2), assuming an entry, whether the principle of administrative finality ordinarily thought applicable in exclusion cases governs here. If either question, or both, be answered in the negative the judgment below should be affirmed. These questions will be discussed in the order stated. A summary of the evidence is essential to an understanding of them.

1. Preliminarily, it may be said that except on the point of appellee's place of birth the facts developed below are not seriously in controversy. The board found that he

was born in Cork, Ireland, and that he had not been naturalized in this country. The court found that he was born in Brooklyn, New York, on November 14, 1898, the son of John and Margaret Bridget Delaney; also that his mother died a week after his birth, and that his father and stepmother took him as an infant to Ireland where he grew up. When he was in his teens he returned, or at any rate came, to the United States and as of the time of the trial had resided here continuously for thirty years. He never married, and no claim is made that he was ever charged with crime. He followed various occupations, working for the most part in shipyards on the Atlantic and Pacific coasts. Once, in the year 1924, he had shipped as a sailor aboard an American vessel and had returned on November 17 of that year as a seaman on the British ship Ninian. This return marked his last entry prior to the San Pedro entry, if the latter can be termed such. From 1937 on he made his home in Long Beach, California, keeping at his living quarters there his personal belongings and effects.

At the time of the inauguration of the selective service system in 1940 he was beyond draft age. In 1943 (the precise date is not clear) he enlisted in the United States Maritime Service, taking the oath of allegiance to the United States. Jurisdiction and control over all merchant shipping had theretofore been assumed by the government acting through the War Shipping Administration.[3] After a period of service aboard a coastwise vessel appellee was directed by the War Shipping Administration to pursue a course in a school for marine engineers conducted by the government at San Francisco. Upon completion of the training the United States Coast Guard (under whose jurisdiction those of his status were) ordered him into service aboard the SS Schenectady, an armed oil tanker. On this vessel he was classified as second assistant engineer with

[2] This statute, so far as immediately pertinent, provides that "In every case where an alien is excluded from admission into the United States, under any law or treaty now existing or hereafter made, the decision of a board of special inquiry adverse to the admission of such alien shall be final, unless reversed on appeal to the Attorney General. * * *"

[3] Executive Order of Feb. 7, 1942, No 9054, 50 U.S.C.A.Appendix, § 1295 note 7 F.R., No. 28, p. 837.

the rank of Lieutenant, his compensation being paid out of the United States Treasury. On June 10, 1944 the Schenectady departed to rendezvous with American task forces upon the high seas, supplying them with oil. Appellee served with the ship on her many wanderings until her return to San Pedro on May 20, 1945, when his troubles with the Immigration Service began.

The Schenectady's duties carried her to Australia, the Persian Gulf, New Zealand, the Marshall Islands, Curacao in the Dutch West Indies, through the Panama Canal again to the Marshall, Caroline and Admiralty Islands and Uluthi, thence home. The ship participated in battle engagements in the Marshall Islands and at Uluthi. For his part in this odyssey appellee was awarded the Atlantic War Zone Bar, the Mediterranean Middle East War Zone Bar, the Pacific War Zone Bar and the Merchant Marine Combat Bar, the last being awarded for "participation in direct enemy action."

At the time of the trial below Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, had not yet beeen decided. Whether, in light of that decision, appellee's San Pedro arrival can properly be regarded as an "entry" may be open to debate. But the Delgadillo case aside, there can be no fair doubt of the morals of the situation confronting the court. We are not able to contemplate with indifference the disquieting fact that when this man came home from his service in the war zones of the world, the nation which had conferred on him a series of decorations in recognition of his services unceremoniously shut the door in his face—not on the claim that he had offended against its institutions or its laws but merely because he lacked paper credentials which, in the circumstances, one could hardly expect him to possess. He was not the traditional sailor pursuing his vocation in a world of peaceful commerce; he was serving the nation in wartime in a task as essential and as perilous as that of a soldier in the zone of battle.

When he was ordered into the service of the Schenectady and later to sea, he did not voluntarily elect a foreign destination. Neither he nor anyone else on board knew at the time of the ship's departure what her destination was to be. That information, because of the necessity of secrecy, was subsequently communicated by wireless. The movements of the ship itself, after leaving its home port, were determined by the Navy, under whose orders the vessel remained throughout its varied wanderings.

Does the return of a resident under these circumstances constitute an entry within the intendment of the immigration laws? We think not. It is true that until very recently, except for an enlightened decision by the Second Circuit, Di Pasquale v. Karnuth, 158 F.2d 878, the federal courts had fallen into the habit of treating every arrival from a foreign port or place as an entry, no matter what the circumstances or however harsh and unanticipated might be the consequences to the individual. The Supreme Court itself, as it has recognized, was not without responsibility for the propagation of this extreme view. But in Delgadillo v. Carmichael, supra, the Court brought a needed measure of restraint into the interpretation of the law on the subject.

The element of volition is lacking in this instance as it was in the Delgadillo case, although the facts are otherwise unlike. To paraphrase the opinion in that case, it was not appellee's voluntary act but the exigencies of a war in which he was a participant that brought him to foreign ports. Of course one may argue, as in effect the government does, that he was under no compulsion to enter the United States Maritime Service in the first place and that he ought to have anticipated his being ordered into the service of a ship destined for foreign waters. But we are not in these circumstances prepared to carry volition to such lengths.

We have remarked that while the Delgadillo case and this one involve the same principle, the facts are in most respects different. There is one striking difference which serves to accentuate the extreme to which the Service has permitted itself to go in this instance. In the Delgadillo

matter there was a measure of moral justification for the Attorney General's treatment of the alien's return as an entry. Subsequent to the return he had committed the crime of robbery and was convicted of it; and as this court observed in the decision later reversed by the Supreme Court it was for his crime, not for his having been the fortuitous victim of the perils of the sea, that his expulsion was ordered. His shipwreck was merely a condition, not the cause, of his attempted banishment. It is impossible to find in the activities of the Service in the present case any comparable justification. In truth, appellee's exclusion from the land which he claims to have given him birth would seem to be the penalty exacted for his having volunteered to serve it in a dread hour of its history. We are not disposed to believe that Congress intended so monstrous an application of the statute.

■ We hold that appellee's return did not constitute an entry. There being in legal contemplation no entry, there could be no exclusion; and the excluding order of the board of special inquiry was void because beyond its authority. It follows that the discharge of appellee from custody was rightly ordered whether or not he is a citizen.

2. If we are wrong in thinking that no entry was involved it does not necessarily follow that the board's finding of alienage was conclusive. Assuming that appellee was technically at the border seeking admission, it still remains to inquire whether he was not entitled to the judicial trial accorded him. We believe the solution of that problem turns upon the effect to be given the circumstance that at the time of his exclusion he was a resident of the United States.

The fact of his residence is not in dispute. The evidence is uncontroverted that throughout his service on the Schenectady it was his intention upon completion of the mission to return to his Long Beach home. He can not, in sum, be thought to have lost his status as a resident because of his temporary absence on shipboard, and it was not administratively found that he had. The question, as we conceive it, is whether a resident of the United States who is denied entry by executive order is entitled as of right, on habeas corpus proceedings, to a judicial trial of his claim to be a citizen. So far as our search of the precedents has gone the question appears to be one of first impression. The authorities supply no direct answer to it.

We turn first to the cases of United States v. Ju Toy and Tang Tun v. Edsell, cited at the outset of this opinion. The Ju Toy decision [198 U.S. 253, 25 S.Ct. 646], handed down in 1905, involved the exclusion by the immigration authorities of a Chinese who claimed to be a native-born citizen of the United States. He sought release on habeas corpus and the district court decided, on new evidence, that he was in fact a citizen. The Supreme Court held that the departmental finding to the contrary was conclusive. It is said that the applicable Chinese Exclusion Act purported to make the decision of the Department final "whatever the ground on which the right to enter the country is claimed—as well when it is citizenship as when it is domicil, and the belonging to a class excepted from the exclusion acts." It was thought that with regard to the petitioner due process of law does not require a judicial trial of his claim of citizenship. The principle was reiterated in Tang Tun v. Edsell, supra, likewise an exclusion case.[4] In neither instance, however, does it appear that the person excluded was presently a resident of the United States.

In 1922 the Court, speaking through Justice Brandeis, decided Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 494, 66 L.Ed. 938. The case involved, among others, two Chinese each of whom claimed to be a foreign-born son of a native-born

---

4 These decisions were doubtless influenced by the existence of the Chinese Exclusion Acts, 8 U.S.C.A. § 263 et seq., and the national policy evidenced by them, and perhaps by the practical difficulties inherent in their enforcement—difficulties which would be intensified if the members of the undesired race were held entitled to a trial more formal than an executive hearing.

citizen, hence to be himself a citizen. They had been ordered admitted as citizens, but some months after entry both were arrested on the warrant of the Department and held for deportation on the ground that they had secured admission by fraud. At the time of the arrest they were living in Arizona. As to them the constitutional question posed by the Court was "May a resident of the United States who claims to be a citizen be arrested and deported on executive order?" The Court observed that the petitioners did more than merely assert a claim of citizenship; they supported the claim by substantial evidence. "The precise question is," said the Court, "Does the claim of citizenship by a resident, so supported both before the immigration officer and upon petition for a writ of habeas corpus, entitle him to a judicial trial of this claim?" The question was answered in the affirmative, it being pointed out that jurisdiction in the executive to order deportation exists only if the person arrested is an alien, and that the claim of citizenship is thus a denial of an essential jurisdictional fact.[5]

Out of this series of decisions grew the divergent rules obtaining in exclusion cases, on the one hand, and in deportation proceedings on the other. In the cases subsequently finding their way into the federal courts on petitions for the writ of habeas corpus the rule has been uniformly applied that an administrative finding adverse to a claim of citizenship, asserted by one seeking to enter the United States, is conclusive on the courts, whereas a like administrative determination in a proceeding to deport has no finality, the individual asserting citizenship being entitled to a judicial trial if his claim is more than merely colorable. The decisions of the first group have largely involved persons of the Chinese race seeking to enter the United States as citizens on the claim that they were children of an American-born parent. These were newcomers who had never resided here. Others excluded were persons who claimed to have been born in the United States and were shown to have resided in this country for varying periods in the past.

■ There is no need to cite the many decisions on the subject. The Second Circuit in United States v. Watkins, 166 F.2d 897, has collected and reviewed numerous of the authorities illustrating the rule of administrative finality obtaining in exclusion cases where citizenship is claimed. We do not question the rule or suggest the need or desirability of departing from it. Our thought is only that it can not constitutionally be applied to one who is a resident of the United States. As to him, the due process of law guaranteed by the Fifth Amendment would seem to require that his substantially supported claim of citizenship be accorded a judicial trial.

In Ng Fung Ho v. White, supra, as has been seen, primary emphasis was placed on the fact of the residence of the petitioner in the United States. The Court observed that to deport one in that category who claims to be a citizen, obviously deprives him of liberty. Deportation may, said the Court, "result also in loss of both property and life, or of all that makes life worth living. Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection in its guarantee of due process of law." Our belief that residence, not the mere form of the proceeding, was regarded as the controlling factor has further support in an observation of Justice Brandeis in his concurring opinion in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 77, 56 S.Ct. 720, 737, 80 L.Ed. 1033. He remarked that "A citizen who claims that his liberty is being infringed is entitled, upon habeas corpus, to the opportunity of a judicial determination of the facts. And, so highly is this liberty prized, that the opportunity must be accorded to any resident of the United States who claims to be a citizen. Compare Ng Fung Ho v. White, 259 U.S. 276, 282-285, 42 S.Ct. 492, 66 L.Ed. 938, with United States v. Ju Toy, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040, and Tang Tun v. Edsell,

5 The principle announced by this case was reaffirmed in the later decisions of the Court in United States ex rel. Bilok- umsky v. Tod, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221, and Kessler v. Strecker, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082.

223 U.S. 673, 675, 32 S.Ct. 359, 56 L.Ed. 606." [6]

Throughout history banishment or exile has been looked upon as a penalty little less dreadful than death. To one in appellee's situation exclusion is in substance and practical effect the equivalent of banishment. It involves the same severance from home and existing ties that the individual suffers who is expelled from the country in a proceeding to deport. There is no difference in their loss of freedom of movement or in the nature of the hardships they are called upon to undergo. The sole distinction resides in the mere matter of nomenclature. The distinction, we think, is of no moment insofar as concerns the Constitutional guaranty of due process of law.

We conclude that the trial court was right in granting appellee a judicial trial of his claim. Its findings that he is a native-born citizen of the United States has impressive support in the evidence and can not be said to be clearly erroneous.

Affirmed.

[6] In the more recently considered exclusion case of Quon Quon Poy v. Johnson, 273 U.S. 352, 358, 47 S.Ct. 346, 348, 71 L.Ed. 680, the Court remarked that, in the light of its previous decisions, "when the petitioner, who had never resided in the United States, presented himself at its border for admission, the mere fact that he claimed to be a citizen did not entitle him under the Constitution to a judicial hearing * * *."