BARBER, DISTRICT DIRECTOR, IMMIGRA-
TION AND NATURALIZATION SERVICE,
*v.* GONZALES.

No. 431.   Argued March 10, 1954.—Decided June 7, 1954.

*Robert W. Ginnane* argued the cause for petitioner. With him on the brief were *Robert L. Stern,* then Acting Solicitor General, *Assistant Attorney General Olney* and *Beatrice Rosenberg.*

*Blanch Freedman* argued the cause for respondent. With her on the brief was *Lloyd E. McMurray.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

Respondent was born in the Philippine Islands in 1913 and came therefrom to the continental United States in 1930. He has lived here ever since. In 1941, he was convicted in the State of California of assault with a deadly weapon and was sentenced to imprisonment for one year in the Alameda County jail. In 1950, he was convicted in the State of Washington of second degree burglary and was sentenced under the indeterminate sentence law of that State to a minimum term of two years in the state penitentiary. In 1951, after an administrative hearing, he was ordered deported to the Philippine Islands under § 19 (a) of the Immigration Act of 1917 as an alien who "after entry" had been sentenced more than once to imprisonment for terms of one year or more for crimes involving moral turpitude. 39 Stat. 889, as amended, formerly 8 U. S. C. § 155 (a).

After respondent was taken into custody, he filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of California. The petition attacked the validity of the deportation order on the ground, among others, that he was not subject to deportation under § 19 (a) since he had not made an "entry" within the meaning of that section. The District Court dismissed the petition. On appeal, the Court of Appeals for the Ninth Circuit, with one judge dissenting, reversed the District Court's judgment and remanded the case with directions to order respondent's release from custody. 207 F. 2d 398. We granted certiorari. 346 U. S. 914.

The sole question presented is whether respondent— who was born a national of the United States in the Philippine Islands, who came to the continental United States as a national prior to the Philippine Independence Act of 1934, and who was sentenced to imprisonment in 1941

and 1950 for crimes involving moral turpitude—may now be deported under § 19 (a) of the Immigration Act of 1917.

It is conceded that respondent was born a national of the United States; that as such he owed permanent allegiance to the United States, including the obligation of military service; that he retained this status when he came to the continental United States in 1930 and hence was not then subject to the Immigration Act of 1917 or any other federal statute relating to the exclusion or deportation of aliens.[1] The Government, however, contends that respondent's status as a national was changed by the Philippine Independence Act of 1934, 48 Stat. 456, which provided for the eventual independence of the Philippines, subsequently achieved in 1946, 60 Stat. 1352. Section 8 (a)(1) of the 1934 Act provides:

"For the purposes of the Immigration Act of 1917, . . . this section, and all other laws of the United States relating to the immigration, exclusion, or expulsion of aliens, citizens of the Philippine Islands who are not citizens of the United States shall be considered as if they were aliens. For such purposes the Philippine Islands shall be considered as a separate country and shall have for each fiscal year a quota of fifty."

---

[1] From the Spanish cession in 1898 until final independence in 1946, the Philippine Islands were American territory subject to the jurisdiction of the United States. See *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, 674–676. Persons born in the Philippines during this period were American nationals entitled to the protection of the United States and conversely owing permanent allegiance to the United States. They could not be excluded from this country under a general statute relating to the exclusion of "aliens." See *Gonzales* v. *Williams*, 192 U. S. 1, 12–13; *Toyota* v. *United States*, 268 U. S. 402, 411. But, until 1946, neither could they become United States citizens. See *Toyota* v. *United States, supra;* 60 Stat. 416.

The Government urges that the reference in § 8 (a)(1) to "citizens of the Philippine Islands" includes Filipinos then residing in the United States; that by virtue of this provision the respondent was assimilated to the status of an alien for purposes of "immigration, exclusion, or expulsion"; and that, having been twice convicted thereafter of crimes involving moral turpitude, he is deportable under § 19 (a) of the Immigration Act of 1917.

The Government's argument is premised on the assumption that respondent made an "entry" within the meaning of § 19 (a). If he did not make such an "entry," then he is not deportable under that section, even assuming that the Government is correct in its broad construction of the 1934 Philippine Independence Act. Section 19 (a) provides:

> ". . . except as hereinafter provided, any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, *committed at any time after entry* . . . shall, upon the warrant of the Attorney General, be taken into custody and deported. . . ." (Italics added.)

The Court of Appeals sustained respondent's contention that he had never made the requisite "entry." With this conclusion, we agree.

The Government would have us interpret "entry" in § 19 (a) in its "ordinary, everyday sense" of a "coming into the United States." Under this view, respondent's "coming into the United States" from the Philippine

Islands in 1930 would satisfy the "entry" requirement. While it is true that statutory language should be interpreted whenever possible according to common usage, some terms acquire a special technical meaning by a process of judicial construction. So it is with the word "entry" in § 19 (a). *E. g., Delgadillo* v. *Carmichael,* 332 U. S. 388; *United States ex rel. Claussen* v. *Day,* 279 U. S. 398; *Di Pasquale* v. *Karnuth,* 158 F. 2d 878; *Del Guercio* v. *Gabot,* 161 F. 2d 559. Cf. *United States ex rel. Volpe* v. *Smith,* 289 U. S. 422, 425.² In *United States ex rel. Claussen* v. *Day, supra,* at 401, this Court stated the applicable rule:

> "The word 'entry' [in § 19 (a)] by its own force implies a coming from outside. The context shows that in order that there be an entry within the meaning of the Act *there must be an arrival from some foreign port or place.* There is no such entry where one goes to sea on board an American vessel from a

---

² In the *Volpe* case, the Court stated:

"We accept the view that *the word 'entry'* . . . [in § 19 (a)] . . . *includes any coming of an alien from a foreign country into the United States* whether such coming be the first or any subsequent one. And this requires affirmance of the challenged judgment. . . . That the second *coming of an alien from a foreign country into the United States* is an entry within the usual acceptation of that word is clear enough from *Lewis* v. *Frick,* 233 U. S. 291; *Claussen* v. *Day,* 279 U. S. 398. An examination of the Immigration Act of 1917, we think, reveals nothing sufficient to indicate that Congress did not intend the word 'entry' in § 19 should have its ordinary meaning." (Italics added.)

The context of the latter sentence makes it clear that the Court regarded the word's "ordinary meaning" as being "any coming of an alien from a foreign country." In the *Delgadillo* case, *supra,* the Court narrowed this definition even further by holding that a resident alien does not make an "entry" from a foreign country if his arrival in the foreign country was unintentional.

port of the United States and returns to the same or another port of this country without having been in any foreign port or place." (Italics added.)

See also *United States ex rel. Stapf* v. *Corsi,* 287 U. S. 129, 132; *Carmichael* v. *Delaney,* 170 F. 2d 239, 242–243. This concept of "entry" was codified by Congress in the Immigration and Nationality Act of 1952.[3]

At the time respondent came to the continental United States, he was not arriving "from some foreign port or place." On the contrary, he was a United States national moving from one of our insular possessions to the mainland. It was not until the 1934 Philippine Independence Act that the Philippines could be regarded as "foreign" for immigration purposes. Having made no "entry," respondent is not deportable under § 19 (a) as an alien who "after entry" committed crimes involving moral turpitude. The Government warns that this conclusion is inconsistent with a broad congressional purpose to terminate the United States residence of alien criminals. But we believe a different conclusion would not be permissible in view of the well-settled meaning of "entry" in § 19 (a). Although not penal in character, deportation statutes as a practical matter may inflict "the equivalent of banishment or exile," *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, 10,

---

[3] Section 101 (a) (13) of the 1952 Act, 66 Stat. 167, 8 U. S. C. § 1101 (a) (13), provides in pertinent part:

"The term 'entry' means any coming of an alien into the United States, from a foreign port or place or from an outlying possession . . . ."

Section 101 (a) (29), 66 Stat. 170, 8 U. S. C. § 1101 (a) (29), defines "outlying possessions" as American Samoa and Swains Island. By a special provision in the 1952 Act, the exclusion process is made applicable to any alien coming to the continental United States from Hawaii, Alaska, Guam, Puerto Rico, or the Virgin Islands. 66 Stat. 188, 8 U. S. C. § 1182 (d) (7).

and should be strictly construed. See *Delgadillo* v. *Carmichael,* 332 U. S. 388, 391. In the absence of explicit language showing a contrary congressional intent, we must give technical words in deportation statutes their usual technical meaning.[4]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE MINTON, with whom MR. JUSTICE REED and MR. JUSTICE BURTON join, dissenting.

But for this Court's holding that § 19 (a) of the Immigration Act of 1917 must be construed strictly and the word "entry" given a special meaning, I would be content with the excellent dissent of Judge Bone in the court below. 207 F. 2d 398, 402.

The effect of the Court's opinion is to construe the Act strictly in favor of the convicted criminal sought to be deported for his criminal acts, rather than in favor of the United States in protection of its citizens. I know of no good reason why we should by strained construction of an Act compel the United States to cling onto alien criminals. It is not the public policy of this country to construe its statutes strictly in favor of alien criminals whose convictions have already been established of record. Why should we give a strained construction to the word "entry" in the instant case? The least we should do is to give the word "entry" its ordinary meaning.

---

[4] The respondent also attacks the validity of the deportation order on the grounds: (1) that he made no "entry" because he was not an alien when he came to this country; (2) that § 8 (a)(1) of the 1934 Philippine Independence Act did not apply to Filipinos already residing here and that hence he was not an alien in 1941 when he was sentenced for one of the two crimes involved in this proceeding; (3) that he is not an alien today because Congress lacked the power to deprive him of his status as a national. Our disposition of the case makes it unnecessary to consider these contentions.

In construing this very statute, this Court said in *United States ex rel. Volpe* v. *Smith*, 289 U. S. 422, 425:

> "An examination of the Immigration Act of 1917, we think, reveals nothing sufficient to indicate that Congress did not intend the word 'entry' in § 19 should have its ordinary meaning."

Cf. *Eichenlaub* v. *Shaughnessy*, 338 U. S. 521.

The case of *Delgadillo* v. *Carmichael*, 332 U. S. 388, lends no authority to this case. In that case, the alien had never voluntarily left the United States for foreign land. His ship was torpedoed. He was blown into the sea. He was rescued and taken to Cuba, from whence he came back to the United States by way of Miami, Florida. This Court said:

> "In this case petitioner, of course, chose to return to this country, knowing he was in a foreign place. But the exigencies of war, not his voluntary act, put him on foreign soil. It would indeed be harsh to read the statute so as to add the peril of deportation to such perils of the sea. We might as well hold that if he had been kidnapped and taken to Cuba, he made a statutory 'entry' on his voluntary return. Respect for law does not thrive on captious interpretations." P. 391.

There is nothing captious or fortuitous about this petitioner's "entry" into the United States. He came to this country from outside, as all aliens do. No case by this Court supports the special construction given by the Court to the word "entry."

Because of the Court's strict construction of this statute, which has the effect of putting a liberal construction on the statute in favor of the alien criminal, which I believe to be contrary to the public policy of this country, I dissent.