**UNITED STATES ex rel. Alejandro Raca ALCANTRA, Appellant,**

**v.**

**John P. BOYD, District Director, Immigration and Naturalization Service, Appellee.**

**No. 14522.**

United States Court of Appeals
Ninth Circuit.

May 10, 1955.

Sarah H. Lesser, Seattle, Wash., A. L. Wirin, Los Angeles, Cal., for appellant.

Charles P. Moriarty, U. S. Atty., Francis N. Cushman, John W. Keane, Richard D. Harris, Asst. U. S. Attys., Seattle, Wash., for appellee.

Before HEALY and POPE, Circuit Judges, and HAMLIN, District Judge.

HEALY, Circuit Judge.

This is an appeal from an order denying a petition for the writ of habeas corpus whereby appellant (hereafter called the petitioner) sought release from the custody of appellee, District Director of the Immigration and Naturalization Service. The latter is holding petitioner for deportation pursuant to an order excluding him from the United States.

█ Petitioner was born in the Philippine Islands and came to the United States in 1928 as a United States national. He has lived here ever since. Notwithstanding his permanent residence, however, his status as a national of the United States terminated July 4, 1946, when the Philippines achieved independence. Thereupon his status became that of an alien. Cabebe v. Acheson, 9 Cir., 183 F.2d 795; Mangaoang v. Boyd, 9 Cir., 205 F.2d 553. It appears that in 1948 he was convicted in California of a crime involving moral turpitude.

During the 1953 Alaska cannery season petitioner was an employee on a floating salmon cannery. He left the continental United States on May 27 of that year and returned on August 6, traveling both ways on American vessels and being at all times within the jurisdiction of the United States. Upon his return to Seattle from Alaskan waters

the Immigration and Naturalization Service took him into custody and subjected him to the administrative processes applicable to an alien seeking to enter the United States as a permanent resident, under section 212(d) (7) of the Immigration and Nationality Act of 1952, 66 Stat. 188, 8 U.S.C.A. § 1182(d) (7). This statute in material part reads:

"The provisions of subsection (a) of this section * * * shall be applicable to any alien who shall leave Hawaii, Alaska, Guam, Puerto Rico, or the Virgin Islands of the United States, and who seeks· to enter the continental United States or any other place under the jurisdiction of the United States * * *. Any alien described in this paragraph, who is excluded from admission to the United States, shall be immediately deported in the manner provided by section 1227(a) of this title."

After petitioner was questioned by an immigration official his case was referred to a special inquiry officer on the assumption that he is an inadmissible alien. There followed a hearing resulting in a finding that petitioner is excludable under subsection 212(a) (9) of the Act as an alien seeking to enter the United States from Alaska, who had been convicted of a crime involving moral turpitude.[1]

█ His appeal to the Board of Immigration Appeals was dismissed. We may remark here that while petitioner claims the contrary, he appears to have been accorded procedural due process.

█ Petitioner's contention is that subsection 212(d) (7) is not applicable to an alien who, as a permanent resident of the continental United States, goes to Alaska for purposes of temporary seasonal employment and then seeks to return. Having in mind the legislative

---

[1] "Excludable classes of aliens * * * (a) Except as otherwise provided in this chapter, the following classes of aliens * * * shall be excluded from admission into the United States * * * (9) Aliens who have been convicted of a crime involving moral turpitude * *." 66 Stat. 182, 8 U.S.C.A. 1182(a) (9).

history of this subsection and the technical meaning generally given the term "entry" where appearing in the immigration laws, we are of opinion that the contention is correct.[2]

As illustrative of the technical interpretation of the term, and of the reasons for such treatment, see Barber v. Gonzales, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009. At page 641 of 347 U.S., at page 824 of 74 S.Ct. its opinion in Gonzales the Court said: "While it is true that statutory language should be interpreted whenever possible according to common usage, some terms acquire a special technical meaning by a process of judicial construction. So it is with the word 'entry' in § 19(a)."[3] The Court quoted the following from United States ex rel. Claussen v. Day, 279 U.S. 398, 401, 49 S.Ct. 354, 73 L.Ed. 758: "'The word "entry" [in § 19(a)] by its own force implies a coming from outside. The context shows that in order that there be an entry within the meaning of the act *there must be an arrival from some foreign port or place.* There is no such entry where one goes to sea on board an American vessel from a port of the United States and returns to the same or another port of this country without having been in any foreign port or place.' (Italics added.)" Later in the opinion in Gonzales the Court remarked that "although not penal in character, deportation statutes as a practical matter may inflict 'the equivalent of banishment or exile', Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433,[4] and should be strictly construed. * * * In the absence of explicit language showing a contrary congressional intent, we must give technical words in deportation statutes their usual technical meaning."

For further authorities on the subject see Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17; Di Pasquale v. Karnuth, 2 Cir., 158 F.2d 878; United States ex rel. Volpe v. Smith, 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298; Carmichael v. Delaney, 9 Cir., 170 F.2d 239; Savoretti v. Voiler, 5 Cir., 214 F.2d 425. The case last cited is of particular interest, although, like the others, it was decided under the 1917 Act. The appellee there (Voiler) was an alien lawfully residing in the United States since 1892. In 1918 he was convicted of robbery and served a term in prison. In 1951 he visited Puerto Rico on business for a few days, returning to the mainland through Miami. Later he was arrested and ordered deported as an alien who prior to entry had committed a crime involving moral turpitude. On petition for habeas corpus he was ordered released and the order was affirmed on appeal, the court holding that the alien had never left the United States and that his arrival at Miami did not constitute an entry.

"Entry" is defined in the 1952 Act, 8 U.S.C.A. § 1101(a) (13), thus: "The term 'entry' means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a law-

---

2. In denying the petition for the writ the district court relied upon International Longshoremen's and Warehousemen's Union v. Boyd, D.C., 111 F.Supp. 802, a proceeding for declaratory relief before a three-judge district court. The latter held subsection 212(d) (7) applicable to one in the petitioner's situation. This decision has since been reversed on the ground that no justiciable controversy was before the three-judge court. International Longshoremen's Union v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650.

3. The reference is to the Immigration Act of 1917.

4. Fong Haw Tan involved § 19(a) of the 1917 Act dealing with the deportation of aliens who have committed crimes involving moral turpitude. The Court resolved doubts as to the intent of Congress in favor of petitioner, saying that to construe the statute less generously to the alien might find support in logic. "But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which *is required by the* narrowest of several possible meanings of the words used." [333 U.S. 6, 68 S.Ct. 376.]

ful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: * * *."

The definition appears merely to be a codification of existing decisional law, see remark of Chief Justice Warren in Barber v. Gonzales, supra, 347 U.S. at page 642, 74 S.Ct. 822. The verbiage relating to volition doubtless evidences adoption by Congress of the philosophy of Delgadillo v. Carmichael, Di Pasquale v. Karnuth, and Carmichael v. Delaney, supra, and like cases, including Yukio Chai v. Bonham, 9 Cir., 165 F.2d 207, all of which involved entries from a foreign port or place in unusual or unintended situations. This portion of the definition is not apposite here nor does its presence afford any difficulty. Petitioner's Alaska venture was not unintended. But neither did he depart the United States to a "foreign port or place or to an outlying possession".[5]

We inquire now into the genesis and the legislative history of subsection 212 (d) (7). As we read that history, it confirms our view of the statute's inapplicability to the facts of the present case. The equivalent of the subsection first became law as a part of section 1 of the Immigration Act of 1917, reading in part as follows: "* * * but if any alien shall leave the Canal Zone or any insular possession of the United States and attempt to enter any other place

under the jurisdiction of the United States, nothing contained in this chapter shall be construed as permitting him to enter under any other conditions than those applicable to all aliens. * * *." 39 Stat. 874, 8 U.S.C. § 173.

As regards this provision of the 1917 Act, Senate Report 355, 63d Congress, 2d Sess., p. 2, stated that the purpose of adding the words "or any insular possession of the United States" was "to make it perfectly clear that the admission of an alien to the insular possessions does not privilege such alien to come to the mainland without examination." The report further stated that the provision was necessary because of "the fact that aliens are using the insular territory (particularly the Philippines and Hawaii) as 'stepping-stones' to the Continent (see letter of Secretary of Labor, S.Doc. No. 451, pp. 3–4)."[6] In adding the verbiage quoted above it would appear that Congress effectively adopted the concept of Healy v. Backus, 9 Cir., 221 F. 358. That decision stood for the proposition that an entry into an insular possession was merely a conditional entry which left the alien subject to further examination before he could enter the continental United States.

We return to the Immigration and Nationality Act of 1952. In considering the proposed legislation the Senate had before it Senate Report 1515, 81st Cong., 2d Sess., containing the results of an investigation of the Immigration Service which had been conducted by the Senate Judiciary Committee. The Report expresses what Congress deemed to be the law prior to 1952. It contains at page 658 the following summary of the special procedures applicable to aliens traveling from the insular possessions to the

---

5. The latter term is defined in (a) (29) of section 1101 as meaning "American Samoa and Swains Island."

6. The secretary's letter referred to states: "The coming of aliens, coastwise, to the mainland from the insular possessions—particularly of Asiatic aliens from the Philippine Islands—has become a matter of grave concern. It is believed the

simple change in the law here suggested would provide a remedy, as under the law so amended the insular possessions could not be used as a stepping-stone to the mainland by aliens of classes whose entry to the mainland would be regarded by all as undesirable, but whose admission to the Philippines, for instance, might not be considered inadvisable. * * *"

continental United States. "Generally," says the Report, "aliens who have been lawfully admitted to any of our insular possessions * * * are not admissible to the continental United States * * * or to any other Territory subject to the jurisdiction of the United States, unless such aliens can satisfy the Immigration and Naturalization Service that they are not inadmissible under the exclusionary provisions of the Act of 1917. Such aliens are thus considered as proceeding from a foreign area to the United States as far as immigration provisions of the Act of 1917 are concerned * * *. Alien residents of the continental United States are not subject to the exclusion provisions of the Act of 1917 when traveling from the continental United States to any of our insular possessions and return."

The report accompanying the final version of the 1952 Act indicates that Congress in enacting section 212(d)(7), did not intend to change the existing law otherwise than to make it applicable to Alaska. As evidence of this we quote on the margin the verbiage of the Report.[7] The government concedes that the *primary* purpose of the subsection was "to prevent excludable aliens from using entry into and residence in the territorial possessions as a means of entry into the United States." We are satisfied that such was its *only* purpose. That view is fortified not alone by the reports but by statements of Representative Walter while discussing on the floor proposed amendments to the subsection. One of his comments was that "it is important to bear in mind the fact that there are a great many aliens in Hawaii who have never been properly screened. * * * It is entirely a question of aliens coming to the United States, and I for one do not think that they should be admitted whether they come from Hawaii or whether they come from Europe, without being screened in order to determine whether or not they are subversive. * * * The only thing under this law that is required of them is an additional screening when they arrive at the Pacific Coast in order to determine whether or not they are admissible under the general immigration laws of the United States; that is all. Why should aliens who happen to be in Hawaii be given preferential treatment?" 98 Cong.Record No. 69, p. 4473.

Given the construction now claimed by the Immigration Service, the subsection would have probable repercussions nowhere mentioned or considered in the course of the Congressional debates. Such construction would impose burdens upon the economy of Alaska, and might well adversely affect the extensive interests in the Pacific Coast states engaged seasonally in the fishing and canning industry in Alaskan waters and ports. Many thousands of workers residing in the continental United States are annually employed in that industry; and one may well assume that substantial numbers of them are aliens who would be put in peril of exclusion and deportation upon their return home. Western representatives in Congress could not but have been alive to these undesirable possibilities, and if they felt that the legislation might be given the scope now claimed for it surely the apprehension would have somewhere received expression.

We hold that the statute has no relevancy here. Accordingly the order denying the petition is reversed and the cause is remanded with instructions to grant the writ.

---

7. "Section 212(d)(7) of the bill continues in effect the special procedures applicable to aliens who travel from the Canal Zone, Territories, or outlying possessions to the continental United States or any other territory under the jurisdiction of the United States. Under the bill such procedures will also be applicable to aliens travling from Alaska to continental United States." S.Rep. 1137, 82d Cong., 2d Sess., p. 14 (H.Rep. 1365, 82d Cong., 2d Sess., p. 53, identical).