**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Hsi Huei TSAI, Defendant–Appellant.**

**No. 00–10483.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 2001.

Filed March 5, 2002.

Robert Hartsock, J. Basil O'Mallan, III, Hagatna, GU, for the appellant.

Karon V. Johnson, Assistant United States Attorney, Frederick A. Black, United States Attorney, Hagatna, GU, for the appellee.

Before: THOMPSON, O'SCANNLAIN, and BERZON, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Concurrence by Judge BERZON

O'SCANNLAIN, Circuit Judge.

We must decide several issues under the Fourth Amendment and the alien smuggling statutes presented by a scheme to bring Chinese aliens into the United States via Guam and Hawaii for financial gain.

I

On October 19, 1999, an Immigration and Naturalization Service (INS) agent stationed at Guam International Airport stopped two passengers attempting to

board a flight to Honolulu. When they were unable to answer his questions, they were taken into custody and their Taiwanese passports discovered to be photo-substitutions (*i.e.*, legitimate passports with the bearers' photographs substituted for the originals). Their real names were He and Chen. Among their belongings were return tickets from Guam to Saipan, in the Commonwealth of the Northern Mariana Islands (CNMI), and a brochure for a Guam hotel, the Sherwood Resort. A check of the hotel's records for the room in which the two had stayed turned up the name and credit card imprint of appellant Hsi Huei Tsai. A review of flight manifests revealed that Tsai was a passenger on the flight He and Chen had attempted to board; that he had also been on the same flight that He and Chen took from Saipan to Guam; and that Tsai was the only other passenger who had taken both flights. The INS agents concluded that Tsai had been escorting He and Chen in their effort to enter the United States illegally.

At this point, Tsai was still on the eight-hour flight to Hawaii. The INS accordingly contacted its agents in Hawaii and instructed them to stop Tsai for questioning and to be on the lookout for any other aliens Tsai might be escorting. Inspector Richard Westlake met Tsai's flight in Honolulu and asked to interview him. Tsai stated that he was a permanent resident alien living in Lawrenceville, Georgia; that he operated a seafood distributorship; and that he had gone to Saipan to investigate seafood purchases, but that when he got there and went to the docks he found them all closed for the weekend, so he was returning empty-handed. At that point Westlake searched Tsai's satchel and carryon bag. He found an airline ticket jacket with "Cheng Wen Ping" and "Chang Ching Hsueh" written inside; the Guam INS agent had informed him that those names were the aliases appearing on He

and Chen's doctored passports and airline tickets. Westlake then informed Tsai that he was being detained for an administrative proceeding before an immigration judge. When an arrest warrant arrived from Guam the next day, Tsai was placed under arrest.

The INS learned from Chen, who cooperated with the investigation and who later testified at trial, that she and He had flown into Saipan from Seoul, South Korea, with a female escort. That escort used the name Jessica Huang and carried a corporate credit card on the account of La Marie Co., Ltd., a company run by Tsai's wife and listing as its business address Tsai's home in Georgia. Huang used that credit card to rent a motel room, where she left He and Chen for several weeks. Chen testified that on October 14, Tsai arrived at the motel room and indicated that he would take He and Chen on the next leg of their journey. Tsai bought them tickets to Guam, checked them out of their motel room, and paid their $996 phone bill. In Guam, they bought tickets to Honolulu, using cash. Tsai boarded the plane first; as noted above, He and Chen were intercepted attempting to embark.

Also found in Tsai's valise at the Honolulu airport were airline vouchers in the name of Yee Khong Lim and Gaik Choo Tan. Using Tsai's credit card records and the information provided by Chen, the INS was able to establish that Lim and Tan were two aliens whom Tsai had escorted from Saipan to Guam to Hawaii in exactly the same fashion the previous month, even staying at the same motels. Lim and Tan subsequently flew on to Newark and, according to INS records, have not left the country.

Tsai also apparently escorted a fifth alien, traveling on a stolen South Korean passport under the name Ji Yeong Yun, to

Atlanta under similar circumstances in August. Tsai, Yun, and Jessica Huang went together to a travel agency on Saipan, where they arranged for Tsai and Yun to travel to Guam together. Tsai and Yun then flew from Guam to Honolulu in adjoining seats; in Honolulu, Tsai bought himself and Yun one-way tickets to Atlanta. Yun has since similarly disappeared.

Tsai was indicted on three counts of bringing unauthorized aliens to the United States for private financial gain, in violation of 8 U.S.C. § 1324(a)(2), and was tried by jury in the U.S. District Court for the District of Guam. Before trial, he moved to suppress the evidence gathered from the search of his valise on the ground that the search violated the Fourth Amendment. The court denied the motion. At trial, Tsai moved for a judgment of acquittal on the ground that the government had failed to prove the element of financial gain. The court denied this motion as well, and the jury convicted him on all three counts. The court sentenced Tsai to thirty-six months' incarceration on each of the first two counts and, over Tsai's objection, to sixty months' incarceration on the third count, all to run concurrently, in accordance with the mandatory minimum provision of § 1324(a)(2). Tsai now appeals his conviction and sentence.

## II

Tsai contends that the search of his valise at the Honolulu airport was not within the category of "routine" border searches for which the Fourth Amendment requires neither individualized suspicion

nor a warrant. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).[1] Tsai's premise is that because Westlake, the INS inspector in Honolulu, knew that Tsai was suspected of criminal activity in Guam, the search was conducted for purposes of criminal investigation, not for the "routine" administrative purposes of enforcing the immigration laws, and was therefore invalid without a warrant. Tsai misconstrues both our border search precedents and the statute that authorized the search.

■ The "critical factor" in determining whether a border search is "routine" is the "degree of intrusiveness it poses." *United States v. Molina–Tarazon*, No. 00–50171, 279 F.3d 709, 713–14 (9th Cir.2002); accord, *e.g., United States v. Ramos–Saenz*, 36 F.3d 59, 61 (9th Cir.1994). For example, our precedents clearly hold that a strip search involves more than a routine invasion of the traveler's personal privacy and therefore requires at least an individualized "real suspicion,"[2] *United States v. Handy*, 788 F.2d 1419, 1420 (9th Cir.1986) (quoting *United States v. Aman*, 624 F.2d 911, 912 (9th Cir.1980)) (internal quotation marks omitted), but that a search of luggage is less intrusive and therefore may be reasonable without a showing of individualized suspicion, *e.g., United States v. Vance*, 62 F.3d 1152, 1156 (9th Cir.1995). In neither case does the subjective motivation for the search serve to impose a warrant requirement that ordinarily does not exist at the border.

1. Tsai does not dispute that the Honolulu airport is the "functional equivalent" of the border for international air travelers, and that the standards for border searches apply to the same extent as at the physical border. *E.g., United States v. Couch*, 688 F.2d 599, 602 (9th Cir.1982).

2. The Supreme Court declined to take this second step in *Montoya de Hernandez*, reserving the question of "what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." *Montoya de Hernandez*, 473 U.S. at 541 n. 4, 105 S.Ct. 3304.

Tsai essentially asks us to conclude that the customary, relatively uninvasive warrantless search that he underwent would be permissible with respect to any passenger *except* those whom the INS had cause to suspect of criminal activity. But this would turn customary Fourth Amendment reasoning on its head! When the warrant requirement applies, as it customarily does, it applies generally. When it is dispensed with, as at the border and under certain other limited circumstances, it is dispensed with equally generally; it does not offer *extra* protection to that subset of those subject to search to whom heightened suspicion attaches. *Cf. United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 593, 151 L.Ed.2d 497 (2001) ("The same circumstances [*i.e.,* a diminished expectation of privacy and an important governmental interest at stake] that lead us to conclude that reasonable suspicion is constitutionally sufficient [for a probation search] also render a warrant requirement unnecessary." (citing *Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001))); *id.* ("Because our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose.").

■ To be sure, subjective motivation is not wholly irrelevant in determining reasonableness under the Fourth Amendment. The Supreme Court has indicated that "Fourth Amendment intrusions undertaken pursuant to a *general scheme* without individualized suspicion" may be invalid if the scheme as a whole "pursue[s] primarily general crime control purposes." *City of Indianapolis v. Edmond,* 531 U.S. 32, 45–46, 47, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (emphasis added). But that is not the case here, as the general validity of the system of border searches without probable cause or warrant is not in question. And an individual suspected of crime may be subjected to facially valid, broadly applicable search schemes on the same basis as other individuals—provided those schemes do, in fact, apply in his case.[3] *See, e.g., Whren v. United States,* 517 U.S. 806, 811–12, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[T]he exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes."); *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (upholding an inventory search absent evidence that it was conducted "in bad faith or for the *sole purpose of investigation*" (emphasis added)). And that question of applicability turns more on examination of the search's scope than on an inquiry into the search-

---

**3.** In some areas, the Fourth Amendment does not require probable cause or a warrant but does demand some quantum of individualized suspicion, as an extra layer of protection against the danger that the government will exploit this latitude for general law enforcement purposes. *See, e.g., United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (holding reasonable suspicion necessary, but also sufficient, to justify "roving-patrol stops," near but not at the border, looking for illegal aliens); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding reasonable suspicion necessary, but also sufficient, to justify a "reasonable search for weapons for the protection of [a] police officer"); *see also Knights,* 122 S.Ct. at 592 & n. 6 (holding that "no more than reasonable suspicion" is required to search a probationer's home). Again, the existence of an independent law enforcement purpose is not dispositive; applying these rules across the board within these areas affords, for example, a suspected check-kiter no less protection against a *Terry* stop than the average citizen enjoys, but a suspected armed robber no more.

er's motivation.[4]

In the case at hand, the INS looked briefly through Tsai's briefcase and luggage. The scope of the search clearly placed it within our cases' definition of a routine border search, requiring neither warrant nor individualized suspicion; although a situation might present itself in which a search at a border objectively did not meet that definition, *see, e.g., Molina–Tarazon*, 279 F.3d at 713–14, that is not what Tsai's case presents, notwithstanding Inspector Westlake's alleged investigative purpose.

In any event, the INS enjoys the specific statutory authority to execute warrantless searches of "the personal effects in the possession of any person seeking admission to the United States, concerning whom such officer or employee may have reasonable cause to suspect that grounds exist for denial of admission to the United States under [the immigration laws] which would be disclosed by such search." 8 U.S.C. § 1357(c) (Supp. II 1996). Based on the information relayed to him from Guam, Inspector Westlake had reasonable cause to believe that Tsai had rendered himself inadmissible by aiding and abetting aliens in their attempt to enter the United States illegally. *See id.* § 1182(a)(6)(E)(i) (1994).[5]

We therefore conclude that the search of Tsai's valise was neither unreasonable nor

---

**4.** One asks, for example, whether a purported frisk for weapons was in fact a frisk for weapons, *e.g., Terry*, 392 U.S. at 29, 88 S.Ct. 1868 (holding that a pat-down search must "be confined in scope to an intrusion reasonably designed to discover ... hidden instruments for the assault of the police officer"), or whether an inventory search was in fact an inventory search, *see, e.g., Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) ("The policy or practice governing inventory searches should be designed to produce an inventory.").

**5.** That Tsai flew from Guam, a U.S. territory, to Honolulu, within the United States proper, does not alter the analysis. Congress has provided for immigration controls on those entering the United States from the territories, and the statutory authority to search applies to efforts to enforce those controls. Of particular relevance here, any alien who travels from Guam to "the continental United States or any other place under the jurisdiction of the United States" is nonetheless subject to removal under § 1182(a)(6)(E)(i) if he is found to have aided or abetted another alien's attempted or successful illegal entry into the United States. 8 U.S.C. § 1182(d)(7) (Supp. II 1996); *see also* 8 C.F.R. § 235.2(a) (2001) ("Any alien coming to a United States port ... from Guam ... shall be regarded as an applicant for admission at that onward port."). Although this circuit has previously held that a lawful permanent resident of the

continental United States who travels to a U.S. territory is not subject to the provisions of § 1182(d)(7), *see United States ex rel. Alcantra v. Boyd*, 222 F.2d 445, 446–49 (9th Cir. 1955), that decision relied upon the definition of the statutory term "entry" as arrival "from a foreign port or place," *id.* at 447 (quoting 8 U.S.C. § 1101(a)(13) (1952)). After *Alcantra* was decided, Congress amended § 1101(a)(13) to provide that a lawful permanent resident alien is nonetheless "regarded as seeking admission into the United States for purposes of the immigration laws" when he "has engaged in illegal activity after having departed the United States." 8 U.S.C. § 1101(a)(13)(C)(iii) (Supp. II 1996). Tsai fell within that provision and was thus "regarded as seeking admission," unlike the petitioner in *Alcantra*, because Tsai's trip from Guam to Saipan took him outside the United States for purposes of the immigration laws and because he there undertook part of the alien smuggling activity in question. *See id.* § 1101(a)(38) (1994) (defining "United States" to include Guam but not mentioning the CNMI). Thus, to summarize: Because Tsai departed the country and there engaged in unlawful conduct, he was "regarded as seeking admission" when he returned to the country, *id.* § 1101(a)(13)(C)(iii), and because he returned to the United States via Guam, he was properly regarded as an applicant for admission at the Honolulu airport, an "onward port" within the United States proper, 8 C.F.R. § 235.2(a).

beyond the INS's statutory authority. The district court thus properly denied the motion to suppress.

### III

▮ Tsai also challenges the sufficiency of the evidence with respect to the element of private financial gain. Because Tsai was charged as an aider and abettor under 18 U.S.C. § 2, the government could make out this element merely by proving that a principal—not necessarily Tsai himself—committed the crime with a pecuniary motive; it need not show "actual payment or even an agreement to pay." *United States v. Angwin,* 263 F.3d 979, 998 (9th Cir.2001). The government offered direct evidence of actual payment in support of the third count (bringing in He and Chen): Chen testified that her sister paid a considerable sum (which she had to borrow) to smuggle her into the United States. Chen also testified that she did not know Tsai and that he was neither a relative nor a friend, which eliminated possible nonpecuniary motives for his actions. Sufficient evidence of financial gain therefore clearly existed with respect to Count III.

▮ The government's evidence on Counts I (Yun) and II (Lim and Tan) was less strong, as none of the three aliens named in those counts testified. However, the fact that all three trips followed almost exactly the same pattern gives rise to an inference that those aliens were also paying for their transport and escort (whether they paid Tsai, Huang, or another confederate). Additionally, both Huang and Tsai readily made substantial out-of-pocket payments (using their La Marie credit cards) for the aliens' expenses.[6] Tsai also advanced He and Chen almost $1000 for their motel phone bill. The government also presented expert testimony from two INS inspectors regarding the usual fees paid to escorts and the usual price paid by a smuggled alien. These factors, plus the "lack of any other possible explanation" for Tsai's willingness to make several twenty-hour trips away from his sole proprietorship in Atlanta, *Angwin,* 263 F.3d at 998, are probative of the element of financial gain. Construing all reasonable inferences from this evidence in the government's favor, as we must, *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we cannot say that no rational jury could have found beyond a reasonable doubt that all three smuggling trips were undertaken for financial gain, *id.* We therefore must reject Tsai's challenge to the sufficiency of the evidence.

### IV

Tsai also challenges his five-year sentence. The statutory provision under which Tsai was convicted, 8 U.S.C. § 1324(a)(2)(B) (Supp. II 1996), provides for a three-year mandatory minimum for a first or second offense of bringing an alien to the United States for financial gain, but a five-year minimum for any subsequent offense. *Id.* The statute further provides that the sentence is calculated "for each alien with respect to whom a violation ... occurs." *Id.* § 1324(a)(2).

Thus, Tsai's conviction on three counts triggered the mandatory minimum for a third offense.[7]

---

**6.** Tsai recouped some of these expenses by cashing in each alien's return ticket after each segment of travel was completed.

**7.** The indictment charged Tsai with smuggling five aliens. However, in light of poten-

tial constitutional problems that might arise under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), from the grouping of two aliens into each of Counts II and III, the government abandoned efforts to seek imposition of a fourth and fifth term

Tsai asserts that the Sentencing Guidelines' provisions on grouping of related offenses should apply to his case because the government alleged a "common scheme" of alien smuggling. The guideline he cites, U.S.S.G. § 3D1.2 (1999), provides that "all counts involving substantially the same harm shall be grouped together into a single Group." *Id.*

This contention appears to raise a question of first impression in this circuit since the 1996 amendments to § 1324(a)(2). However, we conclude that both the text of the statute and the ordinary operation of the Guidelines themselves foreclose Tsai's argument. The Guidelines themselves provide that statutory minima control even when the maximum sentence under the Guidelines is less than the minimum under the statute. *Id.* §§ 5G1.1(b), 5G1.2(b); *see also* 18 U.S.C. § 3553(e) (1994). Therefore, even if Tsai is correct that § 3D1.2 would otherwise apply—a not incontrovertible contention, as he was charged not with conspiracy, but rather with three discrete acts of smuggling—the statutory mimima moot his argument. Regardless of the effect of the grouping provision on the calculation of his base offense level under the Guidelines, that provision has no effect on his sentence if the statute increases his sentence beyond that prescribed by the Guideline sentencing range. We therefore need not decide whether the grouping guideline applies to Tsai's conduct, because the mandatory minimum controls his sentence in any event.

▇ The statute under which Tsai was convicted explicitly states that its sentencing provisions, which include both maxima and minima, apply "for each alien in respect to whom a violation of this paragraph occurs." 8 U.S.C. § 1324(a)(2) (Supp. II 1996). Tsai was convicted under subparagraph (a)(2)(B)(ii), the provision dealing with offenses done for the purpose of private financial gain. The sentencing range for those convicted under that provision is, "in the case of a first or second violation ..., not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years." *Id.* § 1324(a)(2)(B). The entire provision reads as a single sentence (through its various fragmentary subparagraphs), making it clear that the "for each alien" provision and the "first or second violation" provision are to be read together. It therefore appears that a single transaction involving three aliens may count as a first, second, and third violation. We need not draw that conclusion here, however, for Tsai was charged with three *separate* transactions, making it plain that the third instance of smuggling was his third violation of § 1324(a)(2)(B)(ii) for purposes of sentencing.[8] To conclude otherwise would be to require the government to hold three separate trials for a defendant who smuggled three aliens on three separate occasions, rather than adjudicate each violation as a separate count at a single trial, in order to subject the defendant to the five-year minimum.

We therefore conclude that Tsai was properly sentenced to the five-year minimum term.

## V

Tsai's conviction and sentence are AFFIRMED.

---

of imprisonment (which would not have affected the overall sentence in any event, assuming the concurrent sentencing that the Guidelines mandate).

**8.** In reaching this conclusion, we agree with the Eleventh Circuit's construction of the same provision. *See United States v. Ortega–Torres,* 174 F.3d 1199, 1201 (11th Cir.1999); *see also id.* (noting that the legislative history of the provision clearly supports such a reading).

BERZON, Circuit Judge, Concurring.

Although I agree with Parts I, III, IV and V of the majority's opinion and with the result reached, I write separately with regard to Part II.

As to Part II, I would also conclude that the district court did not err in denying the motion to suppress the search. However, I would rely only on the second ground of the majority's opinion—that "Inspector Westlake had reasonable cause to believe that Tsai had rendered himself inadmissible by aiding and abetting aliens in their attempt to enter the United States illegally." *See* 8 U.S.C. § 1182(a)(6)(E)(i) (1994). There is no reason to reach any other question concerning the validity of the search.

As explained in footnote 5 of the majority opinion, although he was coming from Guam, Tsai could properly be "regarded as seeking admission" to the United States. Tsai was therefore subject to removal or denial of admission if he were found to have aided or abetted another alien's attempted or successful illegal entry into the United States, and there was by the time of the search reasonable cause to believe that he had done so. 8 U.S.C. § 1182(a)(6)(E)(i) & (d)(7). The INS has statutory authority to search without a warrant in these circumstances. *See* 8 U.S.C. § 1357(c) (Supp. II 1996). Although Congress cannot authorize an act that violates the Constitution, the search authorized by this statute does not present a Fourth Amendment problem. *See United States v. Ramsey,* 431 U.S. 606, 616–619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

We need not address any broader question concerning the limitations, if any, on border searches. The authority to search at the border has always been justified as "necessary to prevent smuggling and to prevent prohibited articles from entry," *United States v. 12,200–Ft. Reels of Film,* 413 U.S. 123, 125, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), and to determine whether the individual presenting himself at the border is "entitled to come in." *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). A search which happens to be at the border but is not motivated by either of these two "national self protection" interests (*id.*) may not be "routine" in the sense that term is used in the border search cases, as it is not within the rationale for declaring such searches reasonable without a warrant or probable cause.

Here, the search, even if motivated by an interest in enforcing criminal sanctions (which is far from clear), does come within the basic rationale for border searches, as the criminal law at issue is one directly related to entry into the country. So the majority is quite likely correct as to its conclusion that the search remained a routine border search. But there is no reason to address the question here, and I would not do so.