UNITED STATES ex rel. BELFRAGE v. SHAUGHNESSY, District Director of Immigration and Naturalization.

United States District Court
S. D. New York.
June 9, 1953.

Blanch Freedman and Nathan Dambroff, New York City, for petitioner.

J. Edward Lumbard, Jr., U. S. Atty., New York City (William J. Sexton, Asst. U. S. Atty., New York City, Lester Friedman, Attorney, Office of the District Counsel, Immigration and Naturalization Service, United States Department of Justice, New York City, of counsel), for respondent.

WEINFELD, District Judge.

The petitioner, Belfrage, brings this habeas corpus proceeding seeking enlargement on bond pending the hearing and determination of deportation charges against him. He has been detained at Ellis Island since his arrest on May 15th, 1953, under a warrant charging that he is an alien who was a member of, or affiliated with, the Communist Party of the United States in violation of § 241(a) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1251(a) (6). He was denied release on bond by representatives of the Immigration

58

and Naturalization Service acting for the Attorney General.

■ Belfrage contends that the denial of bail was arbitrary and an abuse of discretion. The government, on the other hand, disputes the power of the Court to review the Attorney General's exercise of discretion under the new Immigration and Nationality Act, § 242(a), 8 U.S.C.A. § 1252 (a). In United States ex rel. Chew v. Shaughnessy, D.C., 113 F.Supp. 49, I recently held, following United States ex rel. Yaris v. Esperdy, 2 Cir., 202 F.2d 109, that the power of review has not been curtailed by the new Act.[1] The principles set forth therein, grounded on the Carlson[2] and Potash[3] cases, are applied here in determining the issue as to the reasonableness or arbitrariness of the discretion exercised by the Attorney General.

■ Belfrage is a British subject who has resided here since 1926. In 1937, he established his status as a permanent alien resident and duly filed his declaration of intention to become an American citizen. A final petition was not presented within the seven-year period due to his war service. He served with a British security unit in World War II beginning in October 1941 and worked in France and Germany with Supreme Headquarters Allied Expeditionary Forces (SHAEF) under the direct control of the United States Army from 1944 to October 1945. Upon the termination of his war service he returned to the United States and since 1948 has been the editor of a weekly newspaper. He is married, but separated from his wife. Their two children are native-born Americans.

In its return the government alleges in support of the administrative decision to continue Belfrage in custody that he is and has been for many years an active member of the Communist Party of the United States; that he had been a member of the Communist Party abroad prior to his entry into the United States; that he is and has been active in the world Communist movement in connection with Communist propaganda; that his activities on behalf of the Communist Party have been carefully guarded in view of the underground nature of his assignments, which included espionage activities; that he has traveled to, and has resided in, Russia on official business of the Communist Party and on behalf of the world Communist movement; that he has been closely associated with known and principal leaders of the Communist Party and with persons known to have engaged in espionage activities in its behalf.

Finally, the return charges that on May 5th, 1953, Belfrage appeared before a Committee of the House of Representatives, where he refused to answer questions as to his various activities, including whether he was a member of the Communist Party; and that on May 14th, 1953, when questioned before a Senate Committee, he again invoked his constitutional privilege under the Fifth Amendment.

Thus, except for the allegations concerning Belfrage's appearances before the Senate and House Committees, the return contains no facts which support the conclusory charges of espionage and Communist activity. Names, dates or places are not stated. The general unsupported statements are contained in a return made by an attorney in the office of the District Counsel of the Immigration Service "based on the records and files of the Immigration & Naturalization Service." They are clearly made upon information and belief. The information in "the records and files" has not been disclosed to the Court. Nevertheless, I would have to take the allegations

1. In opposing an application for bail in a matter where relator questioned the power of the Attorney General to impose conditions in a bond allowed after a final order of deportation had been entered, the Department of Justice did not contest the Court's power under the new Act to review the discretion exercised by the Attorney General. Yanish v. Barber, application for bail before Mr. Justice Douglas, May 16th, 1953.

2. Carlson v. Landon, 342 U.S. 524, 72 S. Ct. 525, 96 L.Ed. 547.

3. United States ex rel. Potash v. District Director, 2 Cir., 169 F.2d 747.

of the return as true if they were not denied.[4]

But they are denied. In his sworn amended traverse Belfrage denies that he is or was a Communist; that he engaged in Communist activity or espionage; that he traveled to Russia on the business of the Communist Party; that he has been closely associated with leading Communists or persons known to have been engaged in Communist espionage activity. Belfrage denies that, as the return alleges, he is known by any other name or that his residence is unsettled. He specifically swears that now and since 1950 he has resided at the address he gave to the House Committee; that since his entry into the United States in 1937, the only times he has been outside the United States were for a period of eight weeks in the summer of 1939, writing a film scenario in England under a contract with a film company, two weeks in July of 1943, when he visited the head office of the British Security Coordination in London, England, and the period from 1944 to 1945, when he worked under SHAEF in France and Germany; that since October 1945, he has never been out of the United States; that commencing with that date he has not left New York except for a one month's trip to California, the yearly two weeks' vacation and two or three weekend trips to Chicago. He concedes that in 1936 he visited the Soviet Union for three weeks with his wife. He contends that this was a vacation trip and that it was the only time he has ever been there. Belfrage further alleges upon information and belief that the unidentified espionage activities referred to in the government's return cover the period from November 1941 to December 1943, when he was with the British Security Coordination, which had duly registered him with the Department of Justice under the Foreign Registration Act; that the activities and association with Communists relate to his activity during that period on behalf of the Allied war effort, the confidential nature of which has at all times been known to the Attorney General and the United States Government.

As to his appearances before the Congressional Committees, Belfrage admits refusing to answer the questions referred to in the return, except those concerning his participation in the licensing of United States financed papers in Germany. He states that in 1947 he had been investigated and interrogated by the FBI, and thereafter in the same year he was questioned before a Grand Jury in the United States District Court for this district for two days; that he there answered "fully and at length all the questions concerning his activity—past and present—and his loyalty to this country, including questions relative to past and present membership in the Communist Party, which he then denied, and questions concerning espionage activities against the interests of the United States, which he also then denied" and that the investigations of the FBI and the testimony before the Grand Jury have been known to the Attorney General since 1947.

In the face of the foregoing specific denials and affirmative allegations, the government has made no rejoinder, although it was open to it, by leave of Court, to amend its return and reply thereto.[5]

For more than seven years after the investigations by the FBI and Belfrage's testimony before the Grand Jury, neither the FBI, the immigration authorities, nor prosecuting officials, in full possession of all the facts revealed thereby, made any move to deport him or to prosecute him for any alleged offense against the laws of our country. He was permitted to remain at large and to continue his activities, whatever they were. The subject matter of the FBI and Grand Jury investigations appear to have been so comprehensive as to have included substantially the very matters with respect to which Belfrage exercised his constitutional privilege before the Congressional Committees. The questions which he there declined to answer he had an-

4. See 28 U.S.C. § 2248; cf. United States ex rel. Yaris v. Esperdy, 2 Cir., 202 F. 2d 109, 111.

5. See 28 U.S.C. § 2243.

swered before the Grand Jury under oath, and what he denied then he has again denied here in the traverse and the amended traverse.

Significantly, the government does not claim that, with one exception, any fact now relied upon as grounding his detention without bail was not previously known to the authorities. The exception relates to the exercise of Belfrage's constitutional privilege. But the refusal to answer the Congressional Committees on a plea of constitutional privilege in and of itself in the circumstances of this case does not warrant holding Belfrage without bail pending a hearing of the deportation charges.[6]

"The privilege is for the innocent as well as the guilty and no inference can be drawn against the person claiming it that he fears that he is 'engaged in doing something forbidden by federal law.' * * * 'The truth is that the privilege exists for the sake of the innocent—or at least for reasons irrespective of the guilt of the accused.' "[7]

Belfrage's explanation for his refusal is that he deemed the hearings before the Congressional Committees lacking in the safeguards of a judicial inquiry and that as a result he was concerned that he might find himself unjustly enveloped in difficulties.[8] He charges that the deportation proceedings were commenced solely at the instigation of the Congressional Committees and suggests that the denial of bail does not reflect an "individualized judgment"[9] by

the immigration authorities upon the facts of his case.

■ A resident alien may be held in custody, in the exercise of discretion, if the facts upon which the Attorney General acts reasonably support the inference that were the alien enlarged on bail he would "so conduct himself * * * as to aid in carrying out the objectives of the world communist movement"[10] so as to constitute a menace to the public interest. Proof of membership and present or recent "personal activity in supporting and extending the Party's philosophy concerning violence"[11] furnishes a sufficient basis for detention. Has this test been met?

■ If for the long period of seven years following the FBI and Grand Jury inquiries, immigration and other governmental officials did not consider Belfrage's presence and activities inimical to the nation's welfare and a threat to its security, it is difficult to understand how, overnight, because of his assertion of a constitutional privilege, he has become such a menace to the nation's safety that it is now necessary to jail him without bail pending the determination of the charges, as to which the government has the burden of proof.[12]

■ It is true that the past failure of the government to act does not preclude a present denial of bond where the facts warrant it, but respondent is content to rest upon the unsupported and conclusory allegations in the return. No matter of evidential value has been submitted to support

---

6. No suggestion has been made that detention without bail may be used as a means of enforcing the cooperation of alien residents with branches of the Legislature.

7. Spector v. United States, 9 Cir., 193 F. 2d 1002, 1006.

8. For a general discussion of Congressional Committee procedures, see Rep. Keating of the House Judiciary Committee, "Code for Congressional Inquiries," New York Times Magazine, p. 10, April 5th, 1953.

9. United States ex rel. Chew v. Shaughnessy, supra.

10. Carlson v. Landon, 342 U.S. 524, 544, 72 S.Ct. 525, 536, 96 L.Ed. 547.

11. 342 U.S. at page 541, 72 S.Ct. at page 535.

12. Cf. United States ex rel. Schneider v. Esperdy, D.C., 108 F.Supp. 640, 644: "If proof of Party membership during some past or unspecified period plus failure to testify really makes any of the petitioners a present menace, it would be only reasonable to expect that just as soon as those facts were established the petitioners would have been taken into custody. But that was not done."

the allegations so made.[13] And the assertion by Belfrage of his constitutional privilege in refusing to answer the questions before the Congressional Committees does not supply the proof that is lacking—especially so in the light of his previous and present sworn statements which, if knowingly false, subject him to a charge of perjury.[14] Upon this record the test under the Carlson case has not been met.

There remains the additional question of his availability if released upon bond. Belfrage has at all times appeared whenever required before the FBI, the Grand Jury and the House and Senate Committees. His American-born children are dependent upon him for support. Although separated from his wife, he has discharged his financial and paternal responsibilities toward his dependents. The paper of which he has been editor since 1948 is published in New York City and from that date to his arrest in 1953, he has been at his office daily, with the exception of the periods heretofore noted. No proof has been submitted to challenge his sworn reiteration that since 1950 he resides at 310 West 99th Street, New York City. Prior thereto he resided at another residence—that it was a fixed abode is not disputed. His whereabouts has been known to the authorities at all times and no claim is made that he ever failed to respond to requests for his appearance. Finally and significantly, no contention is made by the government that if released upon bail he will not honor requirements for his appearance in connection with the deportation proceedings.

■ Upon all the facts, it appears that the relator here has sustained the burden that his detention without bond was " 'without a reasonable foundation.' " [15] The writ is sustained to the extent of enlarging the relator upon bond in an amount to be fixed in the order to be entered. Counsel are requested to submit suggestions as to the amount thereof.

Settle order on one day's notice.

finding by the hearing officer that they had been Communists, the Court held detention without bail to be an abuse of discretion.

---

13. Carlson v. Landon, 9 Cir., 186 F.2d 183, 189.

14. Cf. United States ex rel. Schneider v. Esperdy, D.C., 108 F.Supp. 640, where notwithstanding the failure of relators to testify, which in part was the basis of detaining them without bail, and a specific

15. Carlson v. Landon, 342 U.S. 524, 540-541, 72 S.Ct. 525, 534, 96 L.Ed. 547.