Antonio TUTRONE, Plaintiff,

v.

Edward J. SHAUGHNESSY, District Director, Immigration and Naturalization Service, United States Department of Justice, Defendant.

United States District Court
S. D. New York.
March 24, 1958.

Edith Lowenstein, New York City, for plaintiff.

Paul W. Williams, U. S. Atty. for the Southern Dist. of New York, New York City, for defendant, Charles J. Hartenstine, Jr., Sp. Asst. U. S. Atty., New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Plaintiff sues for a declaratory judgment, under Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, to set aside an order and warrant of deportation issued pursuant to an administrative finding that plaintiff is deportable under Section 241(a)(4) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1251(a)(4), as an alien who, after entry, has been convicted of two crimes involving moral turpitude.

The plaintiff has moved for a preliminary injunction restraining enforcement of the order and warrant of deportation pending the determination of this action. Defendant cross-moves for summary judgment under Rule 56, F.R.Civ.P. 28 U.S.C.A., upon the complaint and the administrative record. I will treat the plaintiff's request for an order termi-

nating the deportation proceedings as, in turn, a counter-motion for summary judgment in his favor, pursuant to Rule 56(a), and will determine the issues on that basis.

Plaintiff, who has resided in the United States for some 59 years, was born in Italy in 1897. His parents brought him to the United States as a small infant in 1899. A few years after his arrival Tutrone's mother died and he was placed in an orphanage in Brooklyn. He left the orphanage in 1911 or 1912 and went to live with his father.

The Government contends that the undisputed evidence shows (a) that in 1914, when he was sixteen or seventeen years old, Tutrone, under the name "Charles Marino", was convicted of petty larceny in the Court of Special Sessions of the City of New York upon a plea of guilty and was committed to the House of Refuge, and (b) that, in 1917, under the name of "Joseph Rosso", he was convicted of attempted burglary in the third degree in the Kings County Court upon a guilty plea. The Government therefore asserts that plaintiff is deportable as an alien who at any time after entry has been "convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." 8 U.S.C.A. § 1251(a) (4).

Plaintiff, while denying that the Government has sufficiently established that he was the person convicted in these two cases, asserts that, even were his identity with the named defendants conclusively proven, he would not be deportable because neither of the crimes for which he was convicted involve moral turpitude within the meaning of 8 U.S.C.A. § 1251 (a) (4).

Thus, if it be determined that either of these were not convictions of crimes involving moral turpitude, the plaintiff must prevail since the Government would have failed to establish two such convictions which the statute requires as the prerequisite to deportability on which the Government relies here.

The defendant has two other convictions on his record. The first, in 1920, for possession of burglar's tools, does not involve moral turpitude, as the Government concedes. See United States ex rel. Guarino v. Uhl, 2 Cir., 107 F.2d 399. The other, on a plea of guilty to manslaughter in the second degree, unarmed, under an indictment charging murder in the first degree, is in the same category, as the Government also concedes. United States ex rel. Mongiovi v. Karnuth, D.C.W.D. N.Y., 30 F.2d 825; see, also, In re Schiano Di Cola, D.C.D.R.I., 7 F.Supp. 194.

The incidents giving rise to the manslaughter conviction took place in 1922. Plaintiff was involved in a fight with a man who owed him money. The man drew a revolver and in the ensuing struggle with Tutrone was shot and killed. As a result Tutrone fled New York and was not apprehended until 1938, sixteen years later. He then pleaded guilty to manslaughter in the second degree, served twelve years of a fifteen year sentence and was released in 1950. Upon his release he was arrested on a warrant of deportation and the proceedings now under review ensued. He is said to have lived an exemplary life since his release and there is no evidence to the contrary.

The Government thus stands or falls on its contention that the 1914 conviction for petty larceny and the 1917 conviction for attempted burglary in the third degree were convictions of the plaintiff for crimes involving moral turpitude.

I will assume for purposes of discussion that plaintiff was in fact the person who was convicted of these two crimes. Was the conviction of the plaintiff for petty larceny at the age of sixteen or seventeen, for which he was committed to the House of Refuge, a conviction of a crime involving moral turpitude?

■ The essential question in determining whether a crime involves moral turpitude is whether the proscribed act, as defined by the law of the State in which it was committed, includes elements which necessarily demonstrate the

baseness, vileness and depravity of the perpetrator. Ng Sui Wing v. United States, 7 Cir., 46 F.2d 755, 756; United States ex rel. Mongiovi v. Karnuth, supra. Larceny has been held to be a crime involving moral turpitude no matter how small or insignificant the value of the thing stolen. Quilodran-Brau v. Holland, 3 Cir., 232 F.2d 183; United States ex rel. Ventura v. Shaughnessy, 2 Cir., 219 F.2d 249; Tillinghast v. Edmead, 1 Cir., 31 F.2d 81.

But there have been strong, well-considered and enlightened dissents from this view where the offense was a trifling one and there were mitigating circumstances, e. g., Ex parte Edmead, D.C. Mass., 27 F.2d 438, reversed Tillinghast v. Edmead, 1 Cir., 31 F.2d 81; Anderson, C. J. dissenting in Tillinghast v. Edmead, supra, 31 F.2d 84.

Be this as it may, the real question here is whether the conviction in 1914 of a seventeen year old youth of a first offense of petty larceny with commitment to the House of Refuge can, in this relatively enlightened era, be held to be conviction of a crime which involves moral turpitude—that is to say, necessarily demonstrates the baseness, vileness and depravity of the perpetrator. It seems to me that to hold it was would flout the decent and modern standards for dealing with youthful offenders which have been generally accepted and have been part of the statutory law of the State of New York, and most others, for many years.

In 1943 New York enacted its "Youthful Offender Act", L.1943, c. 549, L.1944, c. 632, New York Code of Criminal Procedure, § 913–e et seq., which provided that a youth who has reached the age of sixteen but has not reached the age of nineteen, who has not been previously convicted of a felony, and who has committed a crime, may be adjudged a youthful offender. A youth so adjudged may not be "denominated a criminal by reason of such determination, nor shall such determination be deemed a conviction." Moreover, "No determination * * * shall operate as a disqualification of any

youth subsequently to hold public office, public employment, or as a forfeiture of any right or privilege or to receive any license granted by public authority." Code of Criminal Procedure, § 913–n. Upon adjudication as a youthful offender the court may suspend sentence, impose sentence and suspend its execution or commit for a period not to exceed three years "to any religious, charitable or other reformative institution." Code of Criminal Procedure, § 913–m.

One of the purposes of the Youthful Offender legislation was to avoid placing on youths who were reasonably capable of rehabilitation the stigma of moral obliquy which would be imposed by a criminal record. The Act proceeds on the theory that the immature youth charged with crime who is not a hardened violator should be rehabilitated to become a useful member of the community. From my own familiarity with how the Act works it is, to say the least, highly unlikely that a first offender of sixteen or seventeen would not be adjudged a youthful offender on a petty larceny charge rather than "convicted" of a crime. In such event he would not be denominated a criminal nor would there be any "conviction" against him. Measures appropriate to his case would be taken looking toward his rehabilitation. He would *not* have been "convicted of a crime involving moral turpitude" within the meaning of 8 U.S.C.A. § 1251(a) (4).

The Government argues that the present Youthful Offender Act does not affect the petty larceny conviction relied on here since in 1914, when it occurred, no such provisions were in effect. It is true that forty years ago modern concepts of dealing with young persons accused of crime had not yet been developed. But even then there were portents of what was to come. The New York Penal Law then provided that a male between the ages of sixteen and eighteen convicted of a misdemeanor could be committed to the House of Refuge at the court's option rather than to the State prison or the penitentiary. Laws of New York, 1913, c. 607, Penal Law, McKinney's Consol.

Laws, c. 40, § 2184. This is what the court elected to do in Tutrone's case.

The purpose of placing a youth in the House of Refuge was to rehabilitate him, and to make him into a useful member of society. It was not designed for those who had committed acts which necessarily demonstrated their vileness, baseness and depravity. It cannot be supposed that the judge who sentenced Tutrone to that institution considered him to be such a person.

In United States ex rel. Cerami v. Uhl, 2 Cir., 78 F.2d 698, 699, holding that a youth committed to the House of Refuge had not been "sentenced to imprisonment" within the meaning of Section 19 of the Immigration Act of 1917 (8 U.S.C. § 155), the Court of Appeals of this circuit said (at page 699):

"It cannot be doubted that the prime object of the maintenance of the House of Refuge and the commitment of persons thereto is reformatory."

And further at page 700:

"We cannot believe that Congress intended by the phrase 'sentenced to imprisonment' to put the humane attempts of modern society to reform and educate minors in institutions like the House of Refuge in the same category with prison sentences of a year or more as a part of the basis for deportation."

The Cerami case was, of course, decided under a statute different from that which controls here and does not pass on the question now before me. But it throws light both on the nature and character of commitments to the House of Refuge and on the intention to be ascribed to Congress in enacting deportation statutes.

It is significant that in the present statute Congress expressly provided that (8 U.S.C.A. § 1251(b)):

"The provisions of subsection (a) (4) of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply * * (2) if the court sentencing such alien

for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported, due notice having been given prior to making such recommendation to representatives of the interested State, the Service, and prosecution authorities, who shall be granted an opportunity to make representations in the matter."

Thus Congress recognized that not every conviction of a crime involving moral turpitude within the legal definition of that term required deportation but that there might well be mitigating circumstances under which the harsh penalty of deportation should not be imposed. Speculation at this time as to what the judge who sentenced Tutrone in 1914 might have done by way of such recommendation had the present statute then been in effect, and he had an opportunity to do so, would not solve the problem presented. But it is plain that Congress did not believe that public policy required a rigid and inflexible application of technical definitions.

It is well-settled that deportation statutes, though not penal in character, may inflict the equivalent of banishment or exile, and should therefore be strictly construed (Barber v. Gonzales, 347 U.S. 637, 642, 74 S.Ct. 822, 98 L.Ed. 1009) and that because of the dire consequences which may result, the language used by Congress should be given the narrowest of several possible meanings (Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433; United States ex rel. Brancato v. Lehmann, 6 Cir., 239 F.2d 663, 666).

And as Judge Learned Hand said in United States ex rel. Mignozzi v. Day, 2 Cir., 51 F.2d 1019, 1021:

"It is of course true that all aliens are here on sufferance; we may deport them when we please, and indeed nobody can much complain who finds himself ousted within a period, say of the five years which mark the

438

line. But this alien has grown to manhood here. To root up all those associations which we call home, to banish him to be an outcast in a country of whose traditions and habits he knows nothing, and where his alienage is a daily, living fact, not a legal imputation—these are consequences whose warrant we may properly scrutinize with some jealousy, and insist that logic shall not take the place of understanding."

 Here we have an alien who has spent fifty-nine of his sixty-one years in this country. His background, language and outlook on life are oriented to the United States. He has no ties with Italy, to which he would be deported and indeed knows as little of that country as he would have had he been born here. True it is that his record is far from good. But the Government's sole ground for deporting him is based on these two convictions which took place over forty years ago. Where the right to deport is based on specific misconduct of the alien subsequent to entry, a presumption of innocence obtains, and it is the Goverment's burden to establish the fact of guilt. Werrmann v. Perkins, 7 Cir., 79 F.2d 467, 469; Hughes v. Tropello, 3 Cir., 296 F..306; see, also, Palmer v. Ultimo, 7 Cir., 69 F.2d 1, certiorari denied 293 U.S. 570, 55 S.Ct. 81, 79 L.Ed. 669; United States ex rel. Belfrage v. Shaughnessy, D.C.S.D.N.Y., 113 F.Supp. 56, affirmed 2 Cir., 212 F.2d 128.

 The circumstances of the 1914 petty larceny conviction including the relative pettiness of the offense, the age of the defendant and his commitment to the House of Refuge, must be considered in the light of the modern viewpoint of the community in dealing with persons of similar age under similar circumstances as expressed in the current statute law of New York. Cf. Brown v. Board of Education, 347 U.S. 483, 492, 74 S.Ct. 686, 98 L.Ed. 873. Viewed in this light it cannot be said that the Government has established that plaintiff was convicted of a crime involving moral turpi-

tude within the meaning of 8 U.S.C.A. § 1251(a) (4) in 1914 and I so hold.

The Government has therefore failed to establish that the plaintiff, after entry, was convicted of two crimes involving moral turpitude and the order of deportation must fall.

In view of this disposition it is unnecessary to consider plaintiff's other contentions that plaintiff was not established to be the persons who were convicted of petty larceny in 1914 and attempted burglary in the third degree in 1917, and that the attempted burglary conviction was not a conviction of a crime involving moral turpitude.

Plaintiff's counter-motion for summary judgment is therefore granted and the order and warrant of deportation are vacated.

Settle order.