Herbert Clyde SQUIRES, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 80–3733.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 21, 1982.

Decided Oct. 7, 1982.

Opinion on Denial of Rehearing and
Rehearing En Banc
Dec. 21, 1982.

Harry Kobel, Rosin & Kobel, P. C., Detroit, Mich., for petitioner.

Lloyd A. Warfield, Immigration & Naturalization Service, James C. Cissell, Cincinnati, Ohio, James P. Morris, Robert Kendall, Jr., Dept. of Justice, Washington, D. C., for respondent.

Before KENNEDY, Circuit Judge, BROWN, Senior Circuit Judge, and DUNCAN,* District Judge.

DUNCAN, District Judge.

Herbert Clyde Squires, a citizen of Canada currently residing in the United States, petitions this Court for relief from an order of the Board of Immigration Appeals directing him to leave the country. Both the Board and the immigration judge below found Squires to be deportable under 8 U.S.C. §§ 1251(a) and 1182(a)(9) as alien who had previously been convicted of a crime involving moral turpitude. Although we differ with those two tribunals in our reasoning, we affirm.

I

Squires entered the United States on or about June 14, 1979, as a nonimmigrant visitor for pleasure. He was authorized to remain in the country for a few days only. On July 30, 1979, the Immigration and Naturalization Service (INS) began deportation proceedings, charging that Squires was excludable on account of a previous criminal conviction in Canada. At the hearing which followed, it was shown that he had been convicted in a Canadian provincial court on August 11, 1970, of the crime of "false pretenses." According to Squires the charges stemmed from his passing of a bad check in 1969 with knowledge that there

were insufficient funds on account to cover it.[1] The records produced by INS show further that Squires was sentenced to six months' imprisonment for the crime, and that all six months were suspended. No other convictions appear on Squires' record.

The immigration judge found that Squires was subject to immediate deportation. He ruled that the offense for which Squires was convicted constituted a "crime involving moral turpitude" within the meaning of 8 U.S.C. § 1182(a)(9), and that Squires was thus an "excludable alien" for purposes of the deportation statute, 8 U.S.C. § 1251(a). The judge recognized the statutory exemption for crimes which are "petty," but he analogized Squires' offense to the domestic crime of false pretenses which, as codified presently, is a felony. On this basis he reasoned that Squires could not take advantage of the petty offense exception. INS was thus ordered to deport Squires at once.

In a short memorandum and order, the Board of Immigration Appeals allowed Squires the privilege of "voluntary departure" from the country, but it upheld *in toto* the immigration judge's findings with respect to deportability. This timely appeal followed.

Squires alleges, *inter alia,* that both the immigration judge and the Board of Immigration Appeals erred in comparing his crime to one which would be a felony in the United States. He contends that on the particular facts of this case, his offense should be considered a misdemeanor. The sole question before us, then, is whether the Canadian crime of "false pretenses" is properly deemed to be a felony for purposes of 8 U.S.C. § 1182(a)(9).

* The Honorable Robert M. Duncan, Judge, U.S. District Court for the Southern District of Ohio, sitting by designation.

1. The precise nature of Squires' offense is not entirely clear, for neither the immigration judge nor the attorneys involved in the case questioned him about it at the deportation hearing. The Certificate of Conviction submitted by INS states simply that on or about September 5, 1969, Squires "unlawfully did by a false pre-

tence, obtain $450.00 in Canadian currency from the Victoria and Grey Trust Co. Ltd., with intent to defraud." Squires had indicated in his initial brief that he obtained the funds by cashing a check at the trust company, despite knowledge on his part that there was not enough money on hand to cover the draft. This account of the crime has not been disputed by INS, and we accordingly adopt it as our own.

## II

Under Section 241(a)(1) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1251(a)(1), aliens who are in certain legally excludable classes at the time of their entry into the United States remain subject to deportation throughout their stay.[2] Among these classes, as defined by Section 212(a) of the Act, 8 U.S.C. § 1182(a), are those who have previously been convicted of a "crime involving moral turpitude."[3] An alien so convicted is ordinarily deportable, except that:

> ... Any alien who would be excludable because of the conviction of a *misdemeanor classifiable as a petty offense* under the provisions of Section 1(3) of Title 18 [U.S.C.], *by reason of the punishment actually imposed,* ... may be granted a visa and admitted to the United States.

(Emphasis added.)   8 U.S.C. § 1182(a)(9).

As is evident from its face, the statutory exemption has two distinct requirements. First, the crime must be a misdemeanor. Title 18, Section 1(2) defines a misdemeanor as any offense which is punishable by one year or less in prison.[4] Second, the crime must have been "petty" in terms of the punishment actually imposed. Title 18, Section 1(3) defines a petty offense as any misdemeanor, "the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500." The exception is thus quite narrow. An alien is not eligible under the exception if the prior conviction was punishable by more than a year in prison, *or* if the punishment actually imposed exceeded imprisonment for six months or a fine of $500.

■ Since Squires was sentenced in Canada to just six months in prison, none of which were actually served, his crime is clearly a petty offense "by reason of the punishment actually imposed," and he meets the second part of the Section 1182(a)(9) proviso. His deportability thus turns in part on the first portion of the test—whether the crime should be characterized as a felony or a misdemeanor. Because the statute under which Squires was convicted, Section 304(1)(a) of the Canadian Criminal Code,[5] carries with it a maximum punishment of ten years' imprisonment where the amount involved exceeds fifty dollars,[6] the crime would appear to be a felony under the statutory definitions set forth in 18 U.S.C. § 1(1) and (2), *supra.* The maximum penalty available under a foreign criminal code is not necessarily dispositive of the crimes characterization for purposes of United States immigration laws, however. To avoid the inconsistencies which would arise by virtue of varying penalties for similar crimes in different nations, the courts look not to the maximum penalty prescribed by foreign law, but rather to the maximum penalty for an analo-

---

**2.** Section 1251(a) is set forth at page 1282, *infra.*

**3.** Here there is little question that Squires' crime was one of "moral turpitude." Any crime which requires intent to defraud as one of its elements fits into this category, *Jordan v. DeGeorge,* 341 U.S. 223, 227–232, 71 S.Ct. 703, 705–708, 95 L.Ed. 886 (1951); *McNaughton v. INS,* 612 F.2d 457 (9th Cir. 1980); *Winestock v. INS,* 576 F.2d 234 (9th Cir. 1978); and, as the Board of Immigration Appeals pointed out, the Canadian crime of "false pretences" plainly has such a requirement. See § 319(1) of the Canadian Criminal Code.

**4.** Title 18, Section 1, provides in pertinent part that:

> Notwithstanding any Act of Congress to the contrary:

> (1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony.
> (2) Any other offense is a misdemeanor....

**5.** At the time of Squires' conviction, Section 304(1)(a) codified the common law crime of "false pretences" and stated in part that:

> (1) Every one commits an offense who
> (a) by false pretence ... obtains anything in respect of which the offense of theft may be committed or causes it to be delivered to another person....

The statute was renumbered without substantive change in 1970; it now appears as Section 320(1)(a). *See* 2 Crankshaw's Crim.Code (Canada) § 320 (8th ed. 1979).

**6.** The minimum amount required under the statute has since been changed to $200. *See* 2 Crankshaw's Crim.Code, *supra* at § 320.

gous statutory offense under the laws of the United States. *Giammario v. Hurney,* 311 F.2d 285 (3d Cir. 1962); *Soetarto v. INS,* 516 F.2d 778 (7th Cir. 1975); *Patel v. INS,* 542 F.2d 796 (9th Cir. 1976). If an equivalent crime cannot be found in Title 18 of the United States Code, the reviewing authority must turn to the provisions of Title 22 of the District of Columbia Code. *Giammario,* 311 F.2d at 287; *Soetarto,* 516 F.2d at 780–781. *See also, Matter of Grazley,* 14 I & N Dec. 330 (BIA 1973); *Matter of Adams,* 10 I & N Dec. 593, 595 (BIA 1964); *Matter of T–,* 6 I & N Dec. 508, 517 (Atty. Gen. 1955). Our initial task, therefore, is to determine an appropriate statutory analog for Section 304(1)(a) of the Canadian Criminal Code.

## A

The immigration judge concluded correctly that there is no federal offense which corresponds directly to Squires' crime. The D.C.Code offers two possibilities, however. Title 22, Section 1301 describes the crime of "false pretenses" and provides in part that:

(a) Whoever, by any false pretenses, with intent to defraud, obtains from any person any service or anything of value, or procures the execution and delivery of any instrument of writing or conveyance of real or personal property, or the signature of any person, as maker, indorser, or guarantor, to or upon any bond, bill, receipt, promissory note, draft, or check, or any other evidence of indebtedness, and whoever fraudulently sells, barters, or disposes of any bond, bill, receipt, promissory note, draft, or check, or other evidence of indebtedness, for value, knowing

the same to be worthless, or knowing the signature of the maker, indorser, or guarantor thereof to have been obtained by any false pretense, shall, if the value of the property or the sum or value of the money, property, or service so obtained, procured, sold, bartered, or disposed of is $100 or upward, be imprisoned not less than one year nor more than three years.

Since an offense under this section is punishable by more than a year in prison, it is plainly a felony. If it is the proper domestic analog to Squires' crime in Canada, then he is clearly excludable.[7]

The D.C.Code also contains a "bad check" statute, 22 D.C.Code § 1410. That section, as it existed at the time of Squires' conviction, stated:

Any person within the District of Columbia who, with intent to defraud, shall make, draw, utter, or deliver any check, draft, or order for the payment of money upon any bank or other depository, knowing at the time of such making, drawing, uttering, or delivering that the maker or drawer has not sufficient funds in or credit with such bank or other depository for the payment of such check, draft, or order in full upon its presentation, shall be guilty of a misdemeanor and punishable by imprisonment for not more than one year, or be fined not more than $1,000, or both.

By its own terms this crime was a misdemeanor when Squires was convicted in Canada. It has since been changed to a felony punishable by one to three years' imprisonment where the amount involved exceeds $100.[8] If this is the appropriate statutory equivalent of Squires crime, and if Squires

---

**7.** In *Matter of Grazely,* 14 I & N 330 (1973), the Board of Immigration Appeals indicated that Section 1301 is indeed the proper statutory analog to the Canadian false pretences statute. There, however, petitioner was held to be within the petty offense exception. Although the Board did not elaborate on its reasons for considering petitioner's crime a misdemeanor, it hinted that the offense involved less than fifty dollars, thus rendering it a misdemeanor under both Sections 1301 and 304(1)(a).

**8.** Title 22, Section 1410 was amended on October 22, 1970, a little more than two months

after Squires' conviction. It now provides that bad check violators shall:

if the amount of such check, draft, order or other instrument is $100 or more, be guilty of a felony and fined not more than $3,000 or imprisoned for not less than one year nor more than three years or both; or if the amount of such check, draft, order or other instrument is less than $100 be guilty of a misdemeanor and fined not more than $1000 or imprisoned not more than one year, or both.

is entitled to the benefit of the statute as it existed at the time of his conviction, then he qualifies for the § 1182(a)(9) exemption and is therefore non-excludable.

Both the immigration judge and the Board of Immigration Appeals chose Section 1301 as the proper equivalent offense. Their reasons for doing so were not set forth, but it appears that they relied simply upon the nominal likeness between Section 1301 and the provision under which Squires was actually convicted. Both sections codify the common law crime of false pretenses in their respective jurisdictions, and each requires proof of similar elements. *Compare Cuillo v. United States*, 325 F.2d 227 (D.C.Cir.1963); and *United States v. Alston*, 609 F.2d 531 (D.C.Cir.1979); with *R. v. McDonald*, 3 Crim.Rptr. (Canada) 259 (N.S.Ct. App.1946); *R. v. Kinsey*, 7 Crim.Rptr. 67 (Alta.S.Ct.1948); and *R. v. Kaszas*, 19 Crim. Rptr. 159 (Alta.Dist.Ct.1954).

We believe, however, that the extreme importance of the interest at stake here requires us to look beyond such facial similarities. As the Supreme Court has observed on many occasions,

> deportation is a drastic measure and at times the equivalent of banishment or exile, *Delgadillo v. Carmichael*, 332 U.S. 388 [68 S.Ct. 10, 92 L.Ed. 17] [1947]. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe [a] statutory provision less generously to the alien might find some support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.

*Fong Haw Tan v. Phelan*, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948). *See also, Barber v. Gonzales*, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009 (1954); *Costello v. INS*, 376 U.S. 120, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964); *INS v. Errico*, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed.2d 318 (1966); *Woodby v. INS*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). This principle has been widely invoked in deportation cases, and it requires the courts to interpret all aspects of the immigration laws, including the Section 1182(a)(9) proviso, liberally in favor of the alien. *Accord, Marino v. INS*, 537 F.2d 686 (2d Cir. 1976).

In determining whether a foreign crime constitutes a misdemeanor for purposes of Section 1182(a)(9), then, it is not enough to rely solely on the label attached to a particular crime by a particular foreign nation. Because deportation involves such serious consequences, a potential deportee is entitled at least to have his previous conviction viewed in light of all the circumstances. The reviewing authorities must choose an equivalent domestic offense only after considering in some depth both the facts which led to the conviction and the differences which may exist between the foreign statutory scheme and its counterpart in the United States. The test is one of basic fairness; a domestic criminal statute is suitable as an equivalent offense under Section 1182(a)(9) only if, under all the circumstances, both factual and legislative, it would be fair to hold the alien accountable for a violation thereunder.

On the facts before us, we are not convinced that it would be fair to view Squires as though he had been convicted under 22 D.C.Code § 1301. Upon review of the relevant criminal laws of Canada, it is clear that Squires was originally charged with the Canadian crime of "false pretenses" because there was no statutory alternative. Section 304(1)(a) of the Canadian Criminal Code, unlike its counterpart in the District of Columbia, does not have a lesser included offense designed specifically for the passing of worthless checks. Indeed, all bad check violators in Canada are prosecuted, if at all, under Section 304(1)(a). *See Malo v. R.*, 18 Crim.Rptr. 154 (Que.Ct.App.1954); *Blevin v. R.*, 19 Crim.Rptr. 183 (Que.Ct.App.1954); *R. v. Morphett*, 13 Crim.Rptr. (n.s.) 270 (B.C. Ct.App.1970). *See also*, 2 Crankshaw's Crim.Code § 320 n. 11 (8th ed. 1979); 6 C.E.D.2d, Crim.Law § 77 (1958); and Mewett & Manning, Criminal Law (Canada)

515–519 (1978).[9] By contrast, one who has knowingly negotiated a worthless draft in the District of Columbia may be prosecuted under either Section 1301 or Section 1410. *See Cuillo, supra.* The latter is a lesser included offense of the former, and, as is evident from its language, Section 1410 is aimed specifically at bad checks. *Id.*

Had Squires committed his crime in the District of Columbia, he could perhaps have been charged with false pretenses under Section 1301. Given the particular circumstances of his crime, however, it is more likely that Squires would have been prosecuted under Section 1410, or would at least have had an opportunity to plead guilty thereunder. From the facts adduced at the deportation hearing, it appears that Squires' crime was little more than a routine bad check violation. There is no indication that Squires was involved in a conspiracy, or that he was engaged in an ongoing practice of writing worthless checks.[10] The amount of money involved was somewhat modest, and the record suggests that this was Squires' first offense. Moreover, the trial judge's imposition of a relatively light sentence indicates that, in his eyes at least, the offense was relatively minor.

Section 1410 thus seems to be more closely tailored to the particulars of this crime than does Section 1301, and INS has introduced nothing to show that Squires' actions were in any sense more heinous than those proscribed by the bad check statute.[11] Un-

der these circumstances we find 22 D.C. Code § 1410 to be a more fitting analog to Squires' offense. We do not mean to imply the lesser of two potential equivalent offenses must always be selected in deportation proceedings. We conclude simply that on these rather peculiar facts, it would be unfair to equate Squires' foreign conviction with the domestic crime of false pretenses.

## B

■ Our inquiry does not end there, however. Since Section 1410 was amended shortly after Squires was convicted in Canada, and a violation thereunder now constitutes a felony if the amount involved is more than $100, we must also consider whether the change in classification applies to aliens who were convicted prior to the change, but who entered the country well afterward. Squires urges us to recognize a rule which would require the foreign conviction to be classified as a misdemeanor so long as its domestic equivalent was so classified at the time of conviction. This "time of conviction" rule would allow Squires to avail himself of the petty offense exception of 8 U.S.C. § 1182(a)(9), and thus stave off deportation. INS, however, advocates a "time of entry" rule which would require the prior conviction to be analogized to a domestic equivalent offense as it existed at the time of entry into the United States. This latter rule would of course have the opposite effect on Squires.

9. Under subsections 304(1)(c) and (d), now renumbered 320(1)(c) and 320(1)(d), anyone who knowingly makes a false statement in writing to procure the payment of money or the acceptance of a check is guilty of an offense punishable by up to ten years in prison. We have found nothing in the relevant Canadian authorities to suggest that either of these subsections have ever been used to prosecute bad check violators. In fact Section 304(4), now renumbered as Section 320(4), suggests that 304(1)(a), now 320(a)(1), is the proper provision under which to charge such offenders.

10. The documents submitted by INS show that a criminal complaint was filed in Canada against Squires late in 1969. It charged that Squires had obtained $100 in cash from the Victoria and Grey Trust Co., Ltd. by false pretences, on or about September 15, 1969—a few days after the crime at issue here. According

to the testimony elicited at the deportation hearing, this latter charge was withdrawn. We therefore attach no significance to it. *See* App. 28 (Transcript of Hearing at 6).

11. Had INS shown, for example, that Canada has a lesser included offense under Section 304(1)(a) for bad checks, but that Squires was for some reason charged and convicted on the greater offense, then the immigration judge could properly have inferred that Squires' crime was of a more serious nature than that reflected by the bad check statute. Under those circumstances he would perhaps have been justified in choosing Section 1301 over Section 1410 as the more appropriate domestic equivalent. Absent such mitigating circumstances, however, the selection of the greater offense is unjustifiable.

Neither of the two proposed rules is specifically mandated by statute or regulation, and we are aware of no court which has resolved the issue. We are therefore left to general principles of statutory construction, as well as to the underlying policies reflected by the language, structure, and legislative history of the statutes involved. Among these principles is the general prohibition expressed in *Fong Haw Tan, supra,* against broad statutory interpretations which unduly restrict the freedom of the alien "beyond that which is required by the narrowest of several possible meanings of the words used." 333 U.S. at 10, 68 S.Ct. at 376. In selecting an appropriate statutory analog for Squires crime, we have placed great stock in this case. In choosing between a "time of conviction" rule and a "time of entry" rule, however, we believe that our reliance thereon must yield to the language of the pertinent statutes and the policy considerations inhering within.

Section 1251(a), the deportation statute, provides in part that:

Any alien in the United States ... shall, upon the order of the Attorney General, be deported who:

(a) at the time of entry was within one or more of the classes of aliens excludable *by the law existing at the time of such entry.*

(Emphasis added.) By referring to "the law existing at the time of ... entry," Congress clearly intended deportability to turn on contemporary federal statutes governing excludable classes, including Section 1182(a)(9).[12] An alien who enters the country subsequent to an amendment in Section 1182(a) or any other excludability provision is thus viewed in light of the new amendment, even though the act or omission which gives rise to excludability occurred well before the change in the law. Whether this same principle was intended to apply to changes in the underlying criminal law upon which domestic equivalent offenses are determined is not altogether clear from the legislative history, however. Since the petty offense proviso to Section 1182(a)(9) was not added until two years after enactment of Section 1251(a),[13] and since the courts did not begin to analogize foreign crimes to domestic offenses until even later,[14] it cannot be said that Congress expressly intended the "time of ... entry" language in Section 1251(a)(1) to apply to changes in criminal statutes as well as to amendments in the immigration laws. Based on our review of the legislative history surrounding Section 1251(a), though, we believe that such an interpretation is fully consistent with the purposes and policies behind the provision.

As has been noted above, Section 1251(a)(1) was enacted as part of the Immigration and Nationality Act of 1952, a comprehensive legislative package revamping the immigration laws to suit this country's post-war needs. Subsection (a)(1) of the statute was passed as originally drafted by both chambers of Congress, and there is little, either in the committee reports or in the extensive debate on the bill, to indicate precisely what Congress meant when it referred to "the law existing at the time of ... entry."[15] The House Report on the Act as a whole, though, begins with a lengthy survey of immigration law and policy in the United States from the late 18th Century onward. H.R.Rep.No. 1365, 82d Cong., 2d Sess.—(1952) *reprinted* in [1952] U.S.C. C.A.A.N. 1653–1674. In it the spon-

---

**12.** See H.R.Rep.No. 1365, 82d Cong. 2d Sess. (1952), reprinted in [1952] U.S.C.C.A.A.N. 1653, 1715–16.

**13.** The petty offense exception was added to Section 1182(a)(9) in 1954. *See* Pub.L. 54–770 § 4 (Sept. 3, 1954). *See also* Sen.Rep.No. 1600, 83d Cong., 2d Sess. (1954), *reprinted in* [1954] U.S.C.C.A.A.N. 3919.

**14.** See *Giammario v. Hurney,* 311 F.2d 285 (3d Cir. 1962).

**15.** For a complete legislative history, see H.R. Rep.No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* [1952] U.S.C.C.A.A.N. 1653, Conf. Rep.No. 2096, 82d Cong., 2d Sess. (1952), *reprinted in* [1952] U.S.C.C.A.A.N. 1753. *See also* 98 Cong.Rec. 4301–4320, 4399–4416, 4422–4444 (debates on H.R. 5678); 98 Cong.Rec. 5088–5116, 5149–5181, 5207–5219, 5228–5240, 5314–5322, 5326–5334, 5408–5442, 5607–5631, 5637–5638, 5756–5804 (debates on S. 2550).

sors of the bill trace the countless changes that have taken place in these laws since the birth of the nation, as well as the specific reasons for those changes. The report also suggests that in contrast to fundamental constitutional provisions, immigration laws are highly sensitive to shifts in popular attitudes toward particular nations or residents thereof. Historically, according to this commentary, the laws of immigration and nationality have changed constantly to reflect current United States foreign and economic policy.

From this legislative background, it is evident that in adopting Section 1251(a), Congress intended deportation proceedings to be consistent with the current state of the law. In directing these proceedings to be conducted in light of "the law existing at the time of ... entry," Congress thus insured that immigration officials deported only those individuals who were somehow "undesirable" by contemporary standards. It also insured that individuals within newly formed classes of excludability could be deported whether or not they had already entered the United States.

Concededly the substantive criminal law used to determine domestic equivalents is less susceptible to the shifting tides of foreign and economic policy than is the law of immigration and nationality. To the extent that an amendment of a criminal statute signals a change in public attitudes toward the seriousness of a particular crime, though, the newer view should be reflected in the immigration laws. In Squires' case the upgrading of a bad check offense from a misdemeanor to a felony indicates that at the time he entered the country the crime was thought to be more reprehensible than originally suspected, at least within the District of Columbia. Measured by the contemporary standards existing at the time of Squires' entry, then, Squires is an ex-felon. To treat him accordingly for purposes of deportation is wholly consistent with the language of Section 1251(a)(1), as well as its history and underlying policy.

Squires' main objection to the "time of entry" rule is that it would give retrospective applicability to the current version of the District of Columbia's bad check statute. He argues that by applying Section 1410, as amended, to his crime in Canada, the Court would in effect be adopting a "relation-back" theory in direct contrast to the principles laid down in *United States ex rel. Brancato v. Lehmann,* 239 F.2d 663 (6th Cir. 1956), and *Costello v. INS,* 376 U.S. 120, 84 S.Ct. 580, 11 L.Ed.2d 559 (1963). INS responds simply and without elaboration that use of the current bad check law would not in any way amount to a retroactive application of it.

We find both arguments wide of the mark. To some extent the proposed "time of entry" rule does involve an element of retroactivity, since it would allow an amendment in the criminal law to be applied in such a way as to confer "ex-felon" status upon an alien who might earlier have been considered only an ex-misdemeanant. The harsh consequences occasioned by this "relation-back" of the current law are immediately apparent. Under the "time of entry" rule, Squires is deportable for having committed a crime in Canada now deemed to be a felony in the United States. Had he entered the United States prior to the amendment of the bad check statute, however, the same crime would have been considered a misdemeanor, and Squires presumably would have been non-excludable under Section 1182(a)(9), hence non-deportable under Section 1251(a)(1).

On its face this rather anomalous result would appear to run counter to precedent both from this circuit and from the Supreme Court. In *United States ex rel. Brancato v. Lehmann, supra,* we held that while denaturalization voids an individual's citizenship *ab initio,* it cannot relate back to destroy his or her status as a citizen for purposes of the deportation statute. We also expressed general disapproval of the relation-back theory offered by the government, relying in part upon *Fong Haw Tan* and *Barber v. Gonzales,* both *supra.*

The Supreme Court reaffirmed this view a few years later in *Costello v. INS, supra.* There petitioner had become a naturalized

citizen in 1925, but had been convicted on two counts of tax evasion in 1954. When it was discovered later that his citizenship had been obtained fraudulently, his certificate of naturalization was cancelled. INS subsequently sought to deport him under Section 1251(a)(4) as an alien who, after entry, had been convicted of two crimes of moral turpitude. INS theorized that since Costello's citizenship had been voided *ab initio,* he was actually an alien when he committed his crimes, not a naturalized citizen.

The Court observed that Section 340(a) of the Act, 8 U.S.C. § 1451(a), gives retrospective force to a denaturalization order, but it refused to interpret this feature of the statute to make the general deportation provision applicable to denaturalized citizens who commit crimes prior to their denaturalization. Expressly rejecting the argument by INS that denaturalization related back to deny Costello's status as a citizen under Section 1251(a)(4) at the time of the crimes, the Court stated that:

> The relation-back concept is a legal fiction at best, and even the respondent concedes that it cannot be "mechanically applied." With respect to denaturalization itself, Congress clearly adopted the concept in enacting § 340(a) [8 U.S.C. § 1451(a)]. But in the absence of specific legislative history to the contrary, we are unwilling to attribute to Congress a purpose to extend this fiction to the deportation provisions of § 241(a)(4) [8 U.S.C. § 1251(a)(4)].

376 U.S. at 130, 84 S.Ct. at 586. *See also Barber v. Gonzales, supra;* and *Eichenlaub v. Shaughnessy,* 338 U.S. 521, 70 S.Ct. 329, 94 L.Ed. 307 (1950).

Notwithstanding this general reluctance to attach retrospective effect to the deportation laws, we believe that neither *Brancato* nor *Costello* are dispositive of the case at bar. Each of these cases interprets statutes which are not directly at issue here. More importantly, both decisions are premised on the utter lack of any authority in the texts or legislative histories regarding retroactivity. Here, however, by referring to "the law existing at the time of ... entry,"

Congress expressly designed Section 1251(a)(1) to reflect changes in the laws of excludability. Although for reasons outlined above, it did not do the same for changes in criminal statutes used to analogize to foreign convictions, such an interpretation is completely in keeping with the language and the purpose of the deportation statute. Unlike the courts in *Brancato* and *Costello,* therefore, we have explicit, albeit indirect, authority for using the relation-back concept in construing the statute before us. Accordingly, we believe these cases to be distinguishable.

In adopting a "time of entry" rule we are not unmindful of the harsh result our ruling will visit upon Squires and others like him. Indeed, we are keenly aware that under the proposed rule Squires will be subjected to an added loss of privileges on account of his prior conviction, even though he was not subject to this same "penalty" at the time he was convicted. If this deprivation truly amounted to punishment for the crime that was committed, then it would clearly be barred by the constitutional prohibition against *ex post facto* laws. Deportation on the basis of misconduct serves an entirely different purpose than does punishment for the misconduct itself, however, and the Supreme Court has repeatedly underscored the distinction by refusing to place the two on equal constitutional footing. *See, e.g., Ekiu v. United States,* 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892); *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); and *Mahler v. Eby,* 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924). In *Harisiades v. Shaughnessy,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952), for example, the Court upheld the validity of the Alien Registration Act of 1940, which allowed deportation of resident aliens who had belonged to the Communist Party prior to passage of the Act. In response to the argument that the Act amounted to an *ex post facto* law, the Court explained:

> ... even if the Act were found to be retroactive, to strike it down would require us to overrule the construction of the *ex post facto* provision which has

been followed by this Court from earliest times. It always has been considered that that which it forbids is penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment. Deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure. Both of these doctrines as original proposals might be debatable, but both have been considered closed for many years and a body of statute and decisional law has been built upon them. In *Bugajewitz v. Adams,* 228 U.S. 585, 591 [33 S.Ct. 607, 608, 57 L.Ed. 978], Mr. Justice Holmes, for the Court, said: "It is thoroughly established that Congress has power to order the deportation of aliens whose presence in the country it deems hurtful. The determination by facts that might constitute a crime under local law is not a conviction of crime, nor is the deportation a punishment: it is simply a refusal by the Government to harbor persons whom it does not want."

(Footnotes omitted.) 342 U.S. at 594, 72 S.Ct. at 521. In light of our determination that a "time of entry" rule is consistent with the legislative intent behind Section 1251(a), then, we must reluctantly tolerate the effect our ruling will have on those like Squires who are prejudiced by the amendment of a domestic criminal statute.[16]/

We are also aware of the inconsistencies that may arise from a "time of entry" rule. It is entirely possible, for instance, that two resident aliens, both of whom were convicted in the same foreign country for the same crime at the same time, may experience opposite results in deportation proceedings, depending upon the precise moment of time in which each entered the United States. The inconsistent outcomes engendered by such a rule are no greater than those which are possible under a "time of conviction" rule, however. The latter rule would potentially lead to inconsistent treatment of resident aliens who violated the same criminal statute in the same foreign country, but who were convicted at slightly different points in time. Both of the proposed rules are thus somewhat arbitrary, and both are susceptible to harsh and inconsistent results in particular cases. We choose the former only because we believe it to be fully in accord with the framework and the historical background of the deportation statute.

For these reasons we conclude that while Squires' offense must be analogized to a violation of the District of Columbia bad check statute, 22 D.C. Code § 1410, the crime must also be considered in light of Section 1410 as amended in 1970. Since violation of that statute amounted to a felony at the time of Squires' entry into the United States, Squires is an excludable alien under 8 U.S.C. § 1182(a)(9), and he is subject to deportation under 8 U.S.C. § 1251(a)(1). Although we do not concur with the rationale employed by the Board of Immigration Appeals in finding Squires deportable, we do agree with its ultimate conclusion. The Board's judgment and order are accordingly AFFIRMED.

### ORDER

This matter is before the Court on a petition for rehearing and suggestion of rehearing en banc in the above-styled case. No judge in active service having moved for rehearing en banc, the motion has been referred to the panel which heard the action originally. The panel has noted nothing of substance in the motion for rehearing which was not carefully considered before issuance of the Court's opinion. The motion is therefore denied.

Petitioner has also suggested that, in the event his motion for rehearing is denied, the Court should modify its affirmance of the Board of Immigration Appeals to make clear that petitioner has the right of voluntary departure pursuant to the Board's previous order and 8 U.S.C. § 1254(e). This request is well taken and is accordingly granted. Petitioner Squires shall have thirty (30) days from the issuance of this order or the termination of any valid stay of deportation to depart voluntarily from the United States.

**16.** We hasten to point out that a "time of entry" rule will presumably benefit some aliens. Although those who are subject to a domestic equivalent offense that has been upgraded to a felony may be excluded from the country, those who are subject to an equivalent that has been downgraded to a misdemeanor will accordingly be able to remain here. Whether the "time of entry" rule results in a greater or lesser number of exclusions than that resulting under a "time of conviction" rule thus depends in part on the number of statutory analogs which are being upgraded relative to those that are being downgraded.